957 A.2d 1110

James Earl GOLDSBERRY, Jr.

v.

STATE of Maryland.

No. 261, Sept. Term, 2007.

Court of Special Appeals of Maryland.

Oct. 6, 2008.

John L. Kopolow, Laurel (Nancy S. Forster, Public Defender, on brief), for Appellant.

Steven L. Holcomb (Douglas F. Gansler, Atty. Gen., on brief), for Appellee.

Panel: DAVIS, JAMES R. EYLER and ALAN M. WILNER (Ret., specially assigned), JJ.

EYLER, JAMES R., J.

James Earl Goldsberry, Jr., appellant, and co-defendant James Myers, Jr.,[1] were charged in the Circuit Court for Prince George's County with first degree premeditated murder, first and second degree felony murder, second degree specific intent murder, attempted robbery with a dangerous [2] weapon, use of a handgun in the commission of a crime of violence, conspiracy to commit first degree premeditated murder, and conspiracy to commit second degree specific intent murder. A jury convicted appellant of second degree felony murder, attempted robbery with a dangerous weapon, use of a handgun in the commission of a crime of violence, and conspiracy to commit second degree murder. The court sentenced appellant to a 30–year term of incarceration for second degree felony murder and the merged conviction of attempted rob-

1. A separate appeal by Mr. Myers is currently pending before this Court.

2. The trial transcript interchangeably refers to "attempted robbery with a dangerous weapon" and "attempted robbery with a deadly weapon." Section 3–403 of the Criminal Law Article uses the term "dangerous weapon," and we shall do so here. Maryland Code (2002 Repl.Vol., 2007 Supp.), § 3–403(a) of the Criminal Law Article (hereinafter "C.L.").

bery with a deadly weapon, a 20–year consecutive term of incarceration for use of a handgun in a crime of violence, and a 30–year concurrent term of incarceration for conspiracy to commit second degree murder. This appeal followed.

Appellant contends that the trial court erred by (1) submitting to the jury a second degree felony murder charge based on the underlying felony of attempted robbery with a dangerous weapon; (2) submitting to the jury a charge of conspiracy to commit murder in the second degree; (3) instructing the jury that only a unanimous verdict was acceptable; (4) terminating representation by co-counsel, thereby denying appellant his right to counsel of choice; and (5) failing to specifically instruct the jury that it need not believe the testimony of an uncontradicted witness.[3] For the foregoing reasons, we shall reverse appellant's convictions of second degree felony murder and conspiracy to commit second degree murder, without the possibility of retrial, and reverse the remaining convictions of attempted robbery with a dangerous weapon and use of a handgun in the commission of a crime of violence and remand for a new trial on those charges.

## Facts

Wendy Braxton, an acquaintance of both appellant and the victim, Vincent Chamberlain, and the sole witness to the attempted robbery and shooting of Mr. Chamberlain, gave an uncontradicted account of the events at trial. Ms. Braxton testified that sometime in March, 2006, while visiting appellant, she received a call from Mr. Chamberlain inviting her and appellant to come to Mr. Chamberlain's house to smoke marijuana.

On arriving at the house, Mr. Chamberlain handed Ms. Braxton some marijuana to roll, and while doing so, she heard appellant and Mr. Chamberlain discuss selling Mr. Chamberlain's marijuana. The three then proceeded to a field behind the house to smoke some of the marijuana. Ms. Braxton

---

3. We have reordered these contentions in accordance with the order in which they are addressed.

again observed appellant and Mr. Chamberlain conversing as they returned from the field. Ms. Braxton then departed with appellant and dropped him off at his apartment.

Ms. Braxton further testified that appellant called her later that evening to ask questions about Mr. Chamberlain. Ms. Braxton subsequently received a call from Mr. Chamberlain asking if she wanted to play cards and requesting that she pick him up. On arriving at Mr. Chamberlain's home at approximately 10:00 p.m., Ms. Braxton testified that she saw appellant and another individual parked in front of the house. Appellant exited the car and spoke with Mr. Chamberlain outside the house. Ms. Braxton further testified that appellant left in his car, stating that he had to "go get something." On returning, appellant proceeded with Mr. Chamberlain to a shed attached to the rear of the house.

Ms. Braxton got out of her car several minutes later and went to the shed to ask Mr. Chamberlain if she could use the bathroom. As Ms. Braxton entered the shed, she saw appellant leave and return with Mr. Myers. Ms. Braxton testified that as appellant and Mr. Myers entered the shed and approached the door leading to the house, appellant drew a gun on Mr. Chamberlain and said "[g]ive me the stuff." Ms. Braxton ran to hide behind a tree, where she observed Mr. Myers chasing Mr. Chamberlain and heard a gunshot. Ms. Braxton then saw appellant run out of the house, Mr. Myers run to the front of the house, and Mr. Chamberlain fall to the ground. After Mr. Myers and appellant fled the scene, Ms. Braxton ran to Mr. Chamberlain and saw blood coming from his head. Unsure of what to do, Ms. Braxton got in her car and left the scene.

As Ms. Braxton was "driving around," appellant called her, asked if she had gone to the police, and requested that they meet. When Ms. Braxton declined appellant's request to meet, appellant told her "snitches get stitches." Ms. Braxton also testified that appellant offered her money, discussed the need "to make up a story," and told her to tell police he was not at the scene.

Ms. Braxton went to stay with a friend, and was called by appellant "four or fives times a day," asking where she was and if she was with the police. Ms. Braxton went to the police two days after the incident. Additional facts are provided below.

## Discussion

### A. *Second Degree Felony Murder Predicated on Attempted Robbery with a Dangerous Weapon*

Appellant argues that the legislature, by expressly designating certain felonies as predicates for first degree felony murder, including attempted robbery with a dangerous weapon,[4] intended to disqualify those felonies as supporting second degree felony murder. Consequently, appellant asserts that second degree felony murder predicated on attempted robbery with a deadly weapon is a "non-existent form of felony murder." We agree.

The trial court's instruction regarding felony murder was as follows:

Question number two reads—and this is what we call felony murder. It's different from first degree premeditated murder. Felony murder can be divided into two degrees. Question two deals with first degree felony murder. That means that each defendant is charged with the crime of felony murder. If your verdict is not guilty on question one, then you go on to two.

---

**4.** Section 2–201(a)(4) of the Criminal Law Article states that a murder committed in perpetration of or attempt to perpetrate the following felonies is first degree murder: "(i) arson in the first degree; (ii) burning a barn, stable, tobacco house, warehouse, or other outbuilding that: 1. is not parcel to a dwelling; and 2. contains cattle, goods, wares, merchandise, horses, grain, hay, or tobacco; (iii) burglary in the first, second, or third degree; (iv) carjacking or armed carjacking; (v) escape in the first degree from a State correctional facility or a local correctional facility; (vi) kidnapping under § 3–502 or § 3–503(a)(2) of this article; (vii) mayhem; (viii) rape; (ix) robbery under § 3–402 or § 3–403 of this article; (x) sexual offense in the first or second degree; (xi) sodomy; or (xii) a violation of § 4–503 of this article concerning destructive devices." C.L. § 2–201(a).

In order to prove the elements of question two, the State must prove that the defendant, or another participating in the crime with that defendant, committed or attempted to commit the underlying felony. The underlying felony in this case is question five, attempted robbery with a deadly weapon. So that's a precursor to question two.

Number two, the second element, is that the defendant, or another participating in the crime, killed the victim, in this case Mr. Chamberlain. That the defendant, or another person participating in the crime, killed the victim.

And, number three, that the act resulting in the death of the victim occurred during the commission of the underlying felony. In this particular case, the underlying crime is the attempted robbery with a deadly weapon. So if the murder occurred during the course of the attempted robbery, that satisfies that element, if proven beyond a reasonable doubt.

It is not necessary for the State to prove that that particular defendant intended to kill the victim. So, in the felony murder, the intent to kill is not necessary to prove.

Now that would be the definition of first degree felony murder, question number two.

If your verdict is not guilty of question number two, then you would go on to question number three, which is second degree felony murder. Second degree felony murder means that the defendant, or another participating in the crime with the defendant, committed or attempted to commit that underlying felony, again, question five, attempted robbery with a deadly weapon.

Element number two, that the way in which the attempted robbery with a deadly weapon was committed or attempted under all the circumstances created—and here's the distinction between first degree felony murder and second degree. In second degree felony murder, that attempted robbery with a deadly weapon created a reasonably foreseeable risk of death or serious physical injury likely to result in death. So that the act created a reasonably

foreseeable risk of death or serious physical injury likely to result in death.

The third element is that, as a result of the way in which the attempted robbery was committed, Mr. Chamberlain was killed. That distinguishes second degree felony murder from first degree. But remember the intent to kill doesn't have to be present for either one.

Defense counsel objected to the instruction on second degree felony murder and, following appellant's conviction on that charge, unsuccessfully moved for a new trial on the same argument pressed before this Court—that Maryland law does not recognize second degree felony murder predicated on attempted robbery with a dangerous weapon.

The existence of second degree felony murder in Maryland predicated on felonies not delineated in the first degree murder statute is well established. *See Fisher v. State,* 367 Md. 218, 251, 786 A.2d 706 (2001) (recognizing second degree felony murder predicated on non-enumerated felonies); *Deese v. State,* 367 Md. 293, 296, 786 A.2d 751 (2001) (reaffirming position that second degree felony murder predicated on an inherently dangerous, non-enumerated felony is a cognizable offense in Maryland). The parties' briefs and this Court's research has not, however, revealed any direct authority on the question of whether a felony sufficient to support first degree murder may also serve as a basis for a second degree felony murder. Nonetheless, the statutory scheme dividing murder into first and second degree, and the cases defining second degree felony murder, compel the conclusion that the same felony cannot serve as a predicate for both first and second degree felony murder.

The Criminal Law Article delineates four categories of first degree murder: (1) a deliberate, premeditated, and willful killing; (2) murder committed by lying in wait; (3) murder committed by poison; and (4) murder committed in perpetration of, or an attempt to perpetrate, an enumerated felony. C.L. § 2–201(a). Murder of a type not listed in § 2–201(a) is in the second degree. *Id.* § 2–204(a). Though not set out in

the statute, the Court of Appeals has defined four types of second degree murder: (1) a murder with intent to kill, but without the premeditation and deliberation required for first degree murder; (2) a killing with intent to inflict such serious bodily harm that death would be the likely result; (3) a depraved heart murder; and (4) a murder committed in perpetration of a felony other than those enumerated in the first degree murder statute. *Thornton v. State,* 397 Md. 704, 721–22 & n. 6, 919 A.2d 678 (2007) (citations omitted).

The Court of Appeals first acknowledged the applicability of the felony murder doctrine to felonies not enumerated in the first degree murder statute in *Fisher,* 367 Md. 218, 786 A.2d 706.[5] In that case, the Court was asked to consider whether child abuse, a non-enumerated felony, could be a basis for applying the felony murder doctrine. *Id.* at 225, 786 A.2d 706. The *Fisher* Court reviewed the history of the statutory scheme dividing murder into degrees and found that its purpose was limited to creating different grades of punishment, and that it had no effect on the felony murder doctrine as it operated at common law. *Id.* at 249–51, 786 A.2d 706. The *Fisher* Court went on to conclude that second degree felony murder was not limited to common law felonies, but instead included felonies creating a danger to life either by their inherent nature or the circumstances of their commission. *Id.* at 251, 263, 786 A.2d 706. Accordingly, the Court held that child abuse, or any other inherently dangerous felony not enumerated in the first degree murder statute, was a proper predicate for second degree felony murder. *Id.* at 263, 786 A.2d 706; *accord Deese,* 367 Md. at 296, 786 A.2d 751; *see also Roary v. State,* 385 Md. 217, 230, 867 A.2d 1095 (2005) (applying *Fisher* to find that first degree assault supported a common law second degree felony murder conviction).

Thus, the felony murder doctrine in Maryland continues to operate as it did at common law by supplying the

---

5. At the time *Fisher* was decided, the first degree murder statute was codified in Article 27, §§ 408–410 of the Maryland Code (1957, 1996 Repl. Vol.).

malice necessary for murder when a criminal homicide occurs in the course of a felony dangerous to life. *Roary*, 385 Md. at 231–32, 867 A.2d 1095; *see also State v. Allen*, 387 Md. 389, 403, 875 A.2d 724 (2005) ("the intended perpetration of the felony is an independent murderous *mens rea*, should death result, and is just as blameworthy and just as worthy of punishment as murder as would be the specific intent to kill" quoting Judge Charles E. Moylan, Jr., *Criminal Homicide Law* § 5.1 at 105 (2002)). Section 2–201(a)(4) functions after-the-fact to penalize murders committed in the course of the enumerated felonies as murders in the first degree. *See Fisher*, 367 Md. at 251, 786 A.2d 706 ("It is only . . . after the felony-murder rule has already operated, that [the first degree murder statute] come[s] into play to provide further that in the case of certain designated felonies, the already established murder shall be punished as murder in the first degree.") (quoting *Evans v. State*, 28 Md.App. 640, 686 n. 23, 349 A.2d 300 (1975), *aff'd*, 278 Md. 197, 362 A.2d 629 (1976)). A felony not listed in § 2–201(a)(4) will nonetheless support felony murder in the second degree if the underlying felony is sufficiently dangerous to life, as judged by the nature of the crime or by the manner in which it was perpetrated. *Roary*, 385 Md. at 229, 867 A.2d 1095; *Fisher*, 367 Md. at 262–63, 786 A.2d 706. Thus, it necessarily follows that the same felony cannot serve as a predicate for both first and second degree felony murder. This Court so stated, albeit by way of dicta, in *Harvey v. State*, 111 Md.App. 401, 681 A.2d 628 (1996), explaining:

> If the homicide occurred in the perpetration or attempted perpetration of a felony spelled out in Md.Code Ann., Art. 27, §§ 408, 409, or 410, for instance, all parties to the crime would be guilty of felony-murder in the first degree. Their individual intents would be immaterial, provided only that they had the necessary intent to commit the underlying felony. If the felony should be one of the residual felonies under the common law felony-murder doctrine and not one of those listed in sections 408, 409, or 410, the guilt of all

participants would then be murder in the second degree, under the common law felony-murder doctrine.

*Id.* at 407–08, 681 A.2d 628.

In this case, the trial court's instruction improperly distinguished first and second degree felony murder based on the manner in which the felony was committed, stating:

> [T]he way in which the attempted robbery with a deadly weapon was committed or attempted under all the circumstances created—and here's the distinction between first and second degree felony murder, that the attempted robbery with a deadly weapon created a reasonably foreseeable risk of death or of serious physical injury likely to result in death.

In fact, the question of whether the felony created a reasonably foreseeable risk of death determines whether the felony murder doctrine applies at all, and has no bearing on the degree of punishment. *See Fisher*, 367 Md. at 250, 786 A.2d 706 (noting that enumeration in the first degree murder statute is not determinative to the analysis of whether a felony may be a predicate for felony murder). If a felony deemed dangerous to life is among those enumerated in § 2–201(a)(4), the punishment for felony murder is in the first degree as a matter of law. C.L. § 2–201(a). If a murder occurs during the course of a non-enumerated dangerous to life felony, it is murder in the second degree. *See* C.L. § 2–204(a) ("A murder that is not in the first degree under § 2–201 of this subtitle is in the second degree.").

■ Attempted robbery with a deadly weapon is, by its nature, a dangerous to life felony, and thus may serve as a predicate for felony murder. Because attempted robbery with a deadly weapon is among the felonies enumerated in § 2–201(a)(4), however, a murder occurring during its commission is punished in the first degree. C.L. § 2–201(a)(4)(ix). Therefore, attempted robbery with a dangerous weapon may not also support a charge of second degree felony murder, regardless of the circumstances or manner of its commission. The trial court's instruction to the contrary misstated the law,

and appellant's second degree felony murder conviction must be reversed.

### B. *Conspiracy to Commit Second Degree Specific Intent Murder*

Appellant also challenges his conviction of conspiracy to commit second degree murder. As with the second degree felony murder charge, appellant objected to the jury instruction on the charge of conspiracy to commit second degree murder and moved for a new trial following his conviction on the ground that there is no such crime in Maryland. The trial court's instruction on conspiracy to commit murder was as follows:

Mr. Goldsberry is alleged to have conspired with Mr. Myers and vice versa; Mr. Myers is alleged to have conspired with Mr. Goldsberry. Here they are alleged to have conspired to commit the crime of first degree premeditated murder, in question seven, or in question eight, second degree specific intent murder.

First degree premeditated murder, the exact same definition I defined for you in question one. Second degree specific intent murder, the same definition I defined for you in question four. So I need not repeat that.

But what does conspiracy mean? Conspiracy is an agreement between two or more persons to commit a crime; in this particular case, murder. In order to convict a defendant of conspiracy, the State must prove that the defendant entered into an agreement with at least one other person— Mr. Goldsberry with Mr. Myers or Mr. Myers with Mr. Goldsberry—to commit that crime, whether it's first or second degree murder.

And, number two, that the defendant entered into the agreement with intent to commit that particular crime. You can infer intent from the circumstances, but intent is a necessary element.

So looking at question seven, that deals with first degree premeditated murder. That deals with first degree pre-

meditated murder. That's why I put it down there, so you know what I'm referring to. Revert back to the definition I gave you in question one. Now you know what first degree premeditated murder is.

If your verdict is not guilty, then you proceed to question eight. If your verdict is guilty, you need not address question number eight. Question eight is, again, second degree specific intent murder.

The trial court defined second degree murder as follows:

What do I mean by second degree specific intent murder? It does not require premeditation or deliberation. Remember in question one? Premeditation, deliberation, willfulness. Second degree specific intent murder does not require premeditation or deliberation.

So in addressing question four, the elements are that the conduct of that particular defendant caused the death of the victim and that the defendant engaged in the deadly conduct either with intent to kill—remember, in felony murder you don't have intent to kill; the State doesn't have to prove it, but they do have to prove intent in first degree and also in second degree.

They don't have to show it's premeditated or deliberate, but they have to show that the defendant engaged in deadly conduct either with the intent to kill or intent to inflict such serious bodily harm that death would be the likely result. Engaged in deadly conduct either with the intent to kill or with the intent to inflict such serious bodily harm that death would be the likely result.

In Maryland, a criminal conspiracy is "the combination of two or more persons to accomplish some unlawful purpose, or to accomplish a lawful purpose by unlawful means. The essence of a criminal conspiracy is an unlawful agreement. The agreement need not be formal or spoken, provided there is a meeting of the minds reflecting a unity of purpose and design.... [T]he crime is complete when the unlawful agreement is reached, and no overt act in furtherance of the agreement need be shown." *Townes v. State,* 314 Md. 71, 75,

548 A.2d 832 (1988). Conspiracy is a specific intent crime; the co-conspirators must join with the specific intent of accomplishing the unlawful object of the conspiracy. *Mitchell v. State*, 363 Md. 130, 146, 767 A.2d 844 (2001).

Second degree murder, as outlined above, consists of four types. *See supra; Thornton*, 397 Md. at 721–22 & n. 6, 919 A.2d 678. The jury instructions here referred only to the two specific intent forms of second degree murder—intent to kill and intent to inflict such serious bodily harm that death would be the likely result. Both parties readily concede that *Mitchell* rules out the possibility of conspiracy to commit second degree murder of the specific intent to kill variety. *See Mitchell*, 363 Md. at 150, 767 A.2d 844 (finding that conspiracy to commit the intent to kill form of second degree murder is not a crime in Maryland). Thus, the only potentially valid basis for appellant's conspiracy conviction is that the jury found him guilty of conspiracy to commit second degree murder of the intent to inflict serious bodily harm form.[6]

As the State's brief indicates, *Mitchell* expressly reserved the question of whether conspiracy to commit other forms of second degree murder are cognizable crimes, but an earlier decision by the Court of Appeals in *State v. Earp*, 319 Md. 156, 571 A.2d 1227 (1990), suggests that they are not. In *Earp*, the Court considered whether intent to do serious bodily harm was a sufficient mental state to support a conviction of attempted murder. *Id.* at 162, 571 A.2d 1227. The Court held that such mental state was inadequate for attempted murder, and that the State must show an intent to kill. *Id.* at 164, 571 A.2d 1227. The Court reasoned that because an attempt is a specific intent crime, the defendant must have the specific intent to commit the crime he is charged with attempting. *Id.* at 163, 571 A.2d 1227. Explaining further, the Court contrasted an attempt with the completed crime of second degree murder, which is "defined in such a way that any one

---

**6.** The question of whether appellant engaged in conspiracy to commit second degree murder of the depraved heart and felony murder forms was not submitted to the jury.

of [several] mental states will suffice." *Id.* at 165, 571 A.2d 1227. In other words, if death results, an intent to commit the acts which constitute murder will suffice.

█ Conspiracy is likewise a specific intent crime. As *Mitchell* explained, "[w]hen the object of the conspiracy is the commission of another crime, as in conspiracy to commit murder, the specific intent required for the conspiracy is not only the intent required for the agreement but also, pursuant to that agreement, the intent to assist in some way in causing that crime to be committed." *Id.* More specifically, "if the conspiracy is to commit murder, the intent must be to commit (or have someone commit) those acts that would constitute murder." *Id.*

This Court, in *Alston v. State*, 177 Md.App. 1, 35, 934 A.2d 949 (2007), *cert. granted*, 403 Md. 304, 941 A.2d 1104 (2008), construed *Earp* and the above quoted language from *Mitchell* to require a showing of specific intent to kill for conspiracy to commit murder.[7] Both attempt and conspiracy are specific intent crimes, and when the goal is murder, the former requires an overt act and an intent to kill. The latter requires an agreement and a specific intent that is "adjunctive to the criminal objective." *Mitchell*, 363 Md. at 146, 767 A.2d 844. We acknowledge that the relevant analysis in *Alston* was dicta because the defendant failed to challenge the jury instructions on conspiracy to commit murder, 177 Md.App. at 40, 934 A.2d 949. Nonetheless, we will not revisit the issue because we reverse on other grounds as well, as explained below.[8] Conse-

---

7. As *Earp* explained, the proper specific intent is actually an "intent to murder" and not an "intent to kill," with intent to murder consisting of an intent to kill coupled with the absence of justification, excuse, or mitigation. *Earp*, 319 Md. at 164, 571 A.2d 1227.

8. Alston is currently pending review in the Court of Appeals. The Court granted certiorari on the following questions: (1) Did the trial court err in denying petitioner's motions for mistrial and for new trial where the jury was not sworn until after the essential conclusion of the State's case? (2) Did the trial court err in sentencing petitioner to life for conspiracy to murder where under the instructions given, the jury

quently, in order to convict appellant of conspiracy to commit murder, the State must have shown an intent to kill. *Mitchell,* however, precludes a conviction of conspiracy to commit second degree murder of the intent to kill variety, therefore, the only proper charge submitted to the jury was conspiracy to commit murder in the first degree. Consequently, the trial court's instruction to the jury that it could convict appellant of conspiracy to commit second degree murder based on an intent to kill or intent to inflict serious bodily injury was erroneous.

   ■ Even if we were to reach a different conclusion regarding this charge, we would nonetheless reverse appellant's conviction of conspiracy to commit second degree murder. First, the court instructed the jury as to both intent to kill and intent to inflict grievous bodily harm. We do not know the basis of the jury's decision. Second, assuming it constitutes a crime, the charge of conspiracy to commit second degree murder should have been submitted to the jury only if generated by the evidence. That question is similar to whether evidence is sufficient to support a criminal conviction. In the latter situation, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *See also Winder v. State,* 362 Md. 275, 325, 765 A.2d 97 (2001); *State v. Albrecht,* 336 Md. 475, 479, 649 A.2d 336 (1994). We simply cannot find any evidence in the record to support the existence of an agreement between appellant and Mr. Myers to inflict serious bodily injury on Mr. Chamberlain, but not to kill him, much less evidence that could convince a rational fact finder beyond a reasonable doubt. When questioned on the subject at oral argument, the State pointed to the fact that the pair acted together to rob Mr. Chamberlain at gunpoint as the only circumstantial evidence supporting the

---

could have found petitioner was guilty only of conspiracy to commit second degree murder?

existence of a conspiracy. If this evidence alone were to suffice, a conspiracy would exist in every instance in which two individuals act together to commit a crime that could conceivably result in serious bodily injury to the victim. Such minimal evidence plainly does not, by itself, establish the necessary elements of a conspiracy. Accordingly, the trial court should not have instructed the jury on the charge of conspiracy to commit second degree specific intent murder. *See May v. Giant Food, Inc.*, 122 Md.App. 364, 388, 712 A.2d 166 (1998) ("If the requested instruction is not supported by the evidence in the case, it should not be given"); *see also Rustin v. Smith*, 104 Md.App. 676, 680, 657 A.2d 412 (1995); *Moats v. Ashburn*, 60 Md.App. 487, 493, 483 A.2d 791 (1984).

■ Appellant's conviction of conspiracy to commit second degree murder is therefore reversed on the ground that Maryland does not recognize the crime of conspiracy to commit second degree murder of the intent to inflict serious bodily harm variety, and alternatively, because this charge was not supported by legally sufficient evidence.

### C. *The Trial Court's Instructions on the Unanimity Requirement*

■ Appellant next contends that the trial court erred by instructing the jury that "anything short of a unanimous verdict is not acceptable," arguing that the statement impaired the deliberative process because "[i]t tends to coerce a minority, against their better judgment, to join the majority." This statement was part of the trial court's instructions on the unanimous verdict requirement, which included the following: "Your verdict as to each and every charge, as to each defendant, must be unanimous. Anything short of a unanimous verdict is not acceptable. Unanimous means a 12 to nothing vote." The trial court did not provide any additional instructions on the deliberative process. After the trial court completed its instructions to the jury, Mr. Myers's counsel, in an objection joined by appellant, requested that the court strike the contested language.

"The purpose of jury instructions is to aid the jury in clearly understanding the case and . . . to provide guidance for the jury's deliberations by directing their attention to the legal principles that apply to and govern the facts in the case; and to ensure that the jury is informed of the law so that it can arrive at a fair and just verdict." *Molock v. Dorchester County Family YMCA, Inc.,* 139 Md.App. 664, 672, 779 A.2d 963 (2001) (citing *Robertson v. State,* 112 Md.App. 366, 385, 685 A.2d 805 (1996)). "An important aspect of this guidance is providing a description of the process by which the jury is supposed to deliberate." *Thompson v. State,* 371 Md. 473, 479, 810 A.2d 435 (2002).

Maryland Criminal Pattern Jury Instruction ("MPJI–Cr") 2:03 on the unanimous verdict requirement states: "Your verdict must represent the considered judgment of each juror and must be unanimous. In other words, all twelve of you must agree." Maryland Criminal Pattern Jury Instruction 2:01 further instructs the jury on its duty to deliberate as follows:

The verdict must be the considered judgment of each of you. In order to reach a verdict, all of you must agree. Your verdict must be unanimous.

You must consult with one another and deliberate with a view to reaching an agreement, if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors.

During deliberations, do not hesitate to reexamine your own views. You should change your opinion if convinced you are wrong, but do not surrender your honest belief as to the weight or effect of the evidence only because of the opinions of your fellow jurors for the mere purpose of reaching a verdict.

Maryland Criminal Pattern Jury Instruction (MPJI–Cr) 2:01.

Both MPJI–Cr 2:01 and 2:03 note that the verdict must represent the individual judgment of each juror, and neither instructs the jury that anything but a unanimous

verdict is "not acceptable." In *Kelly v. State*, 270 Md. 139, 310 A.2d 538 (1973), the Court of Appeals held that an *Allen*-type charge[9] which "reasonably adheres" to Standard 15–4.4 (formerly Standard 5.4) of the ABA Standards for Criminal Justice: Discovery and Trial by Jury (3d ed. 1996) ("ABA Standards") may be appropriate. Maryland Criminal Pattern Jury Instruction 2:01 was derived from, and is substantially similar to the ABA Standards, and has likewise received approval from the Court of Appeals. *Thompson*, 371 Md. at 485, 810 A.2d 435 (2002); *Graham v. State*, 325 Md. 398, 409 n. 4, 601 A.2d 131 (1992). Although the trial court has some discretion to decide what precise language to use when giving an *Allen*-type charge describing the deliberative process, *Kelly*, 270 Md. at 143, 310 A.2d 538, substantial deviations in substance from the approved pattern instructions mandate a reversal and new trial. *Thompson*, 371 Md. at 485–87, 810 A.2d 435; *see also Goodmuth v. State*, 302 Md. 613, 622, 490 A.2d 682 (1985) permissible deviations are limited to "form and style" (citing *Burnette v. State*, 280 Md. 88, 101, 371 A.2d 663 (1977)).

In *Thompson*, the Court held that a personalized instruction suggesting "the primacy of collective judgment over individual principle and honest conviction" was reversible error. 371 Md. at 487, 810 A.2d 435. Specifically, the Court pointed to the statement that "the final test of the quality of your service will lie in the verdict which you return to the Court, not in the opinions any of you may hold as you retire," and noted that it encouraged jurors to surrender their individual convictions in order to reach a collective judgment. *Id.* at 486, 810 A.2d 435. The Court reached this conclusion despite the fact that the instructions included a statement that jurors should consult with each other in order "to arrive at a just verdict" but were not required "to yield an honest conviction after such consultation or deliberation." *Id.* at 479, 810 A.2d 435.

---

**9.** The term *"Allen*-type charge*"* refers to instruction informing the jury of its responsibilities, including the duty to deliberate. *See generally Kelly v. State,* 270 Md. 139, 310 A.2d 538 (1973).

In *Goodmuth,* the Court of Appeals, relying on its earlier decision in *Burnette,* held that a traditional *Allen* instruction given prior to the jury's deliberations was coercive and erroneous. 302 Md. at 623, 490 A.2d 682. The rejected instruction in that case was as follows:

> You are instructed that your verdict must be unanimous. You are further instructed that there are many cases in which absolute certainty cannot be expected. Although the verdict must be the verdict of each individual juror as a result of his own conviction and not a mere acquiescence of the conclusions of his fellows, each one of you should examine the questions submitted with candor and with proper regard and deference to the opinion of your fellow jurors. It is your duty to decide this case if you can conscientiously do so, and you should listen with a disposition to be convinced to each other's argument. If your views are contrary to those of the vast majority, you should consider whether your views, which make no impression on the minds of so many equally intelligent jurors, are correct.

*Id.* at 315, 490 A.2d 682.

In this case, the only instruction given the jury relating to the deliberative process resembled MPJI–Cr 2:03, with the added caveat that "[a]nything short of unanimous verdict is not acceptable." No attempt was made to further describe the deliberative process with an instruction similar to the ABA Standards or MPJI–Cr 2:01. Without such an instruction, the jurors could have easily construed the language "[a]nything short of a unanimous verdict is not acceptable" to mean that they should sacrifice their individual judgment to reach a collective verdict. Even though the instructions in *Thompson* and *Goodmuth* attempted to inform the jurors that they should reach an individual conclusion and not yield to the majority, they were nonetheless erroneous for emphasizing the need for a collective verdict over individual judgment. *See* discussion of *Thompson* and *Goodmuth supra.* In comparison, the instruction here, which completely omitted any guidance on the deliberative process and told the jury that anything less than unanimity was unacceptable, was at least as

coercive as the instructions in those cases. Consequently, we must reverse appellant's remaining convictions and remand for a new trial.

Though our holding on this issue does not require us to reach appellant's remaining contentions, we shall nevertheless do so in the event these issues are raised on retrial.

## D. *Denial of Counsel of Choice*

Appellant next argues that the trial court's ruling prohibiting continued representation by co-counsel Joseph Mckenzie violated his right to counsel of choice. The initial ruling occurred during a pretrial motion to sever brought by co-defendant James Myers, when counsel for Mr. Myers informed the court that Mr. Mckenzie had spoken to her client about the facts of the case while he was represented.[10] Mr. Myers's counsel argued that the conversation potentially violated Maryland Lawyers' Rules of Professional Conduct (hereinafter "RPC") Rule 1. 18, involving duties to prospective clients, and Rule 4.2, concerning communication with a person represented by counsel. Mr. Myers's counsel also contended that the conversation prejudiced her client because his decision whether to testify would be influenced by the knowledge that he would be subject to cross-examination by Mr. Mckenzie.

Mr. Mckenzie conceded that he had discussed the facts of the case with Mr. Myers, but stated that Mr. Myers made no admissions to him. Andrew Jezic, co-counsel for appellant, told the court that once he learned of the encounter, he instructed Mr. Mckenzie to ascertain whether Mr. Myers was represented and, if not, to secure counsel for him as soon as possible. Mr. Jezic also stated that during their initial discussion he told Mr. Mckenzie never to tell him anything about the conversation with Mr. Myers, and that the two maintained a "Chinese wall" from that period onward.

---

10. Myers's counsel contended that a line of appearance was entered in the District Court on April 17th, while Mr. Mckenzie stated that his conversation with Mr. Myers occurred in late March or early April.

The trial court found that Mr. Mckenzie had not conveyed the substance of his conversation with Mr. Myers to Mr. Jezic, and that Mr. Mckenzie did not know Mr. Myers was represented at the time of their conversation. Nevertheless, the trial court ruled that Mr. Mckenzie could not continue to represent appellant. Mr. Jezic then objected on the basis of appellant's Sixth Amendment right to counsel of choice, and stated that appellant desired Mr. Mckenzie to remain at the trial table. The trial court agreed, but emphasized that Mr. Mckenzie could not communicate anything to Mr. Jezic regarding his conversation with Mr. Myers.

The prosecutor then informed the court that one of the State's witnesses, Tawanna Davis, had testified to the grand jury that she was "coached" by Mr. Mckenzie and appellant prior to her appearance, and that he might have to question Ms. Davis on the matter if she changed her testimony at trial. On hearing this, the trial court concluded that Mr. Mckenzie had placed himself in the position of being a possible witness in the case and revised its ruling, to prohibit Mr. Mckenzie from sitting at the trial table. The trial court also denied Mr. Myers's motion for a severance, and ruled that Ms. Davis could testify only after the State proved the existence of a conspiracy. When the prosecution attempted to call Ms. Davis the following day, the court conducted an *in camera* hearing and ruled that Ms. Davis could not testify during the prosecution's case in chief, but that she could testify as a rebuttal witness if appellant testified.[11]

At the close of the State's case, Mr. Jezic moved for a mistrial, arguing that Mr. Mckenzie had been excluded from the courtroom for the entire case.[12] Mr. Jezic further assert-

---

**11.** The trial court initially believed Ms. Davis's testimony was admissible under the hearsay exception for statements made by a co-defendant in furtherance of a conspiracy, but later adduced that the statements were made after the conspiracy had ended.

**12.** Though the trial court initially permitted Mr. Mckenzie to remain in the audience, a ruling immediately prior to opening statements required witnesses to remain outside the courtroom until called to testify.

ed that, due to Mr. Mckenzie's exclusion, he and appellant's other co-counsel, John Giannetti,[13] had been unable to discuss the evidence with Mr. Mckenzie. The trial court responded by noting its ruling did not prohibit Mr. Mckenzie from communicating with Mr. Jezic and Mr. Giannetti as long as it did not involve the conversation with Mr. Myers.

■■■■■ The right to counsel granted by the Sixth Amendment to the U.S. Constitution, and applied to the States through the Fourteenth Amendment, *Gideon v. Wainwright,* 372 U.S. 335, 342, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), encompasses a criminal defendant's right to select counsel of his choice.[14] *Wheat v. U.S.,* 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). This is a qualified right, however, because "the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat,* 486 U.S. at 159, 108 S.Ct. 1692; *see also Moore v. State* 390 Md. 343, 404, 889 A.2d 325 (2005) (noting the Supreme Court's recognition that "the Sixth Amendment right to counsel of choice, in certain situations, is qualified"). For example, a defendant may not insist on representation by "an advocate who is not a member of the bar . . . [or] on representation by an attorney he cannot afford or who for other reasons declines to represent the defendant. Nor may a defendant insist on the counsel of an attorney who has a previous or ongoing relationship with an opposing party. . . ." *Id.* "Moreover, [the right to counsel of choice] will not be permitted to frustrate, the orderly administration of criminal justice." *Moore,* 390 Md. at 405, 889 A.2d 325 (citations omitted).

*Wheat* illustrates the application of these principles. 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140. In Wheat, Mark

---

**13.** It is not clear from the record when Mr. Giannetti began representing appellant.

**14.** The Sixth Amendment states that: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const., amend. VI.

Wheat, one of several co-defendants charged with participating in an extensive conspiracy to distribute drugs, moved to substitute counsel who was already representing two of his co-defendants. *Id.* at 154–55, 108 S.Ct. 1692. Despite Wheat's assertion of his right to counsel of choice, and his co-defendants' willingness to waive conflict-free representation, the United States District Court denied the substitution based on the irreconcilable conflict of interest that would have resulted if any of the co-defendants were called to testify against one another. *Id.* at 157, 108 S.Ct. 1692. The Supreme Court affirmed, noting that the right to counsel of choice is subject to a court's "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Id.* at 160, 108 S.Ct. 1692. The Court also acknowledged the difficult position of a trial court in such situations, observing that the "likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict," and that a trial court must exercise its judgment "in the murkier pre-trial context" without the "wisdom of hindsight." *Id.* at 163, 108 S.Ct. 1692.

Though the potential conflicts in this case were different from those in *Wheat,* the trial court here similarly acted within its discretion in determining that appellant's right to counsel of choice was outweighed by the countervailing interests of fairness, maintaining ethical standards, and avoiding conflicts of interest. Continued representation of appellant by Mr. Mckenzie could have violated RPC 1.18 and jeopardized Mr. Myers's right to a fair trial. In addition, Mr. Mckenzie's "coaching" of Ms. Davis made him a possible witness in the case and presented a potential violation of RPC 3.7, prohibiting a lawyer from acting as an advocate in trial where the lawyer is likely to be called as a witness. Though Ms. Davis was ultimately restricted in her testimony, the trial court did not have the benefit of hindsight when it made its ruling. In addition, appellant was not deprived of his right to counsel of choice. Appellant was still represented by Mr. Jezic—whom he selected—and the trial court's ruling permitted Mr. Mcken-

zie to assist in appellant's defense by consulting with Mr. Jezic and Mr. Giannetti as long as they did not discuss the conversation with Mr. Myers. Thus, the trial court's ruling properly balanced appellant's qualified right to counsel against competing factors that weighed against continued unrestricted representation by Mr. Mckenzie.[15]

Appellant's reliance on *Gonzalez–Lopez* is misplaced. In *Gonzalez–Lopez*, the defendant was represented by an attorney hired by his family, John Fahle, and a second attorney, Joseph Low, that he personally hired. Before the trial, the defendant informed Fahle that he only wanted to be represented by Low. *Id.* at 142, 126 S.Ct. 2557. The United States District Court denied multiple applications for admission *pro hac vice* by Low based primarily on the erroneous conclusion that he had violated the Missouri equivalent of Rule 4.2 in a separate matter, forcing the defendant to retain another attorney to represent him at trial. *Id.* at 142–43, 126 S.Ct. 2557.

In that case, however, both parties agreed that the United States District Court had erroneously deprived the defendant of his counsel of choice, and the Supreme Court's analysis was limited to whether the defendant was required to show prejudice and whether the ruling was subject to review for harmless error. *Id.* at 144–48, 126 S.Ct. 2557. The Supreme Court also emphasized that its ruling did not disturb any of the previous limitations placed on the right to counsel of choice, flatly stating that "[n]one of these limitations ... is relevant here." *Id.* at 152, 126 S.Ct. 2557. Further, unlike *Gonzalez–Lopez*, the trial court here did not err in its interpretation of the ethics rules, but instead correctly assessed that continued unfettered representation of appellant by Mr. Mckenzie creat-

---

**15.** The trial court also found that there was "absolutely no prejudice" to appellant in terminating representation by Mr. Mckenzie. We acknowledge that under *United States v. Gonzalez–Lopez*, 548 U.S. 140, 148, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006), a defendant is not required to show prejudice in order to establish a violation of the right to counsel of choice, but the lack of prejudice to a defendant may nevertheless be a legitimate factor when balancing the right to counsel of choice against competing considerations.

ed a very real possibility of violations. Also of note is that fact that in *Gonzalez–Lopez* the defendant was deprived of his only counsel of choice, whereas here appellant was still represented by his co-counsel of choice, Mr. Jezic. Finally, the trial court's decision was not based on Mr. Mckenzie's conduct in a separate matter, as in *Gonzalez–Lopez,* but was instead based on actions *in this case.* Thus, the trial court was well within its bounds to restrict appellant's qualified right to counsel of choice.

### E. The Trial Court's Instructions on the Credibility of Witnesses

■ Appellant's final contention is that the trial court erred by failing to specifically instruct the jury that it need not believe the testimony of an uncontradicted witness. Appellant argues this omission was especially damaging because Ms. Braxton, the sole witness to the events leading to appellant's conviction, was uncontradicted. The trial court's instruction on the credibility of witnesses was as follows: "You need not believe the testimony of any witness. That's certainly within your prerogative. You may believe all, part or none of the testimony of any witness. That's solely within your parameters."

Maryland Criminal Pattern Jury Instruction 3:10 on the credibility of witnesses includes, in part, the statement that "[y]ou need not believe any witness, *even if the testimony is uncontradicted.* You may believe all, part or none of the testimony of any witness." (emphasis added). Appellant correctly points out that the trial court mistakenly believed it had read MPJI–Cr 3:10 verbatim when it denied Mr. Myers's request, joined by appellant, to include the phrase "even if the testimony is uncontradicted."

■ "In evaluating the propriety of a trial court's refusal to give a requested instruction, we must determine whether the requested instruction was a correct statement of the law; whether it was applicable under the facts of the case; and whether it was fairly covered in the instructions actually

given." *Grandison v. State,* 341 Md. 175, 211, 670 A.2d 398 (1995) (quoting *Gunning v. State,* 347 Md. 332, 348, 701 A.2d 374 (1997)); *Redcross v. State,* 121 Md.App. 320, 326, 708 A.2d 1154 (1998). The requested instruction satisfies the first two prongs of this test, thus the only question here is whether the instructions actually given fairly covered the point raised by appellant. Departure from the pattern instructions does not by itself constitute error. *See, e.g., Sydnor v. State,* 133 Md.App. 173, 184, 754 A.2d 1064 (2000) ("generally [ ] the wise course of action is to give instructions in the form, where applicable, of our Maryland Pattern Jury Instructions ... however, deviation from the recommended language ... does not per se constitute error."). Moreover, jury instructions "must be considered as a whole and the Court will not condemn a charge because of the way in which it is expressed or because an isolated part of it does not seem to do justice to one side or the other." *Smith,* 403 Md. at 664, 944 A.2d 505. Though the given instructions did not specifically refer to uncontradicted witnesses, they repeatedly informed the jurors that it was within their discretion whether to believe the testimony of *"any* witness." (emphasis added). The word "any" necessarily includes uncontradicted witnesses, and there was nothing in the instructions to otherwise suggest that the jury could not disbelieve uncontradicted testimony. Thus, the credibility of witnesses was fairly covered by the given instructions, and we find no reversible error in the omission of the phrase requested by appellant.

## Conclusion

In summary, appellant's convictions of the non-existent crimes of second degree felony murder predicated on attempted robbery with a deadly weapon, and conspiracy to commit second degree specific intent murder are reversed. Appellant's remaining convictions of attempted robbery with a dangerous weapon and use of a handgun in commission of a crime of violence are also reversed, and his case is remanded for a new trial on these charges.

CONVICTIONS FOR SECOND DEGREE FELONY MURDER AND CONSPIRACY TO COMMIT SECOND DEGREE MURDER REVERSED. CONVICTIONS FOR ATTEMPTED ROBBERY WITH A DANGEROUS WEAPON AND USE OF A HANDGUN IN COMMISSION OF A CRIME OF VIOLENCE REVERSED AND REMANDED FOR A NEW TRIAL. COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.