18 A.3d 836

**STATE of Maryland**

v.

**James Earl GOLDSBERRY, Jr.**

**No. 141, Sept. Term, 2008.**

Court of Appeals of Maryland.

April 26, 2011.

Daniel J. Jawor, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for petitioner/cross-respondent.

John L. Kopolow, Assigned Public Defender (Nancy S. Forster, Public Defender, Laurel, MD), on brief, for respondent/cross-petitioner.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

BARBERA, J.

Respondent, James Earl Goldsberry, Jr., was tried before a jury in the Circuit Court for Prince George's County and convicted of second degree felony murder, conspiracy to commit second degree murder, attempted robbery with a dangerous weapon, and use of a handgun in the commission of a crime of violence. He appealed the judgments of conviction to the Court of Special Appeals, where he raised a number of claims. The Court of Special Appeals, finding merit in some of those claims, reversed the convictions. The court remanded the case for a new trial on the charges of attempted armed robbery and use of a handgun, but not the charges of second degree felony murder and conspiracy to commit second degree murder. *Goldsberry v. State,* 182 Md.App. 394, 957 A.2d 1110 (2008).

We granted the parties' respective petitions for certiorari to consider whether: (1) the trial court violated Goldsberry's right under the Sixth Amendment to representation by his counsel of choice, by disqualifying one of Goldsberry's three privately retained attorneys; (2) the trial court erred in its instruction to the jury regarding unanimity; and (3) the Court of Special Appeals erred in holding that Goldsberry was improperly convicted of the "nonexistent" crime of second degree felony murder predicated on attempted robbery with a dangerous weapon.

For the reasons that follow, we hold that the trial court violated Goldsberry's right to counsel of choice and the intermediate appellate court erred in its holding regarding the felony murder conviction. Because our disposition entitles Goldsberry to a new trial, we do not address the propriety of the court's unanimity instruction.

I.

Goldsberry and his co-defendant, James Myers, Jr., were tried jointly on charges arising from the homicide of Vincent

Chamberlain. As explained in more detail *infra*, the jury found that Goldsberry and Myers attempted to rob Chamberlain of his marijuana, and while doing so, Myers shot Chamberlain in the head, killing him.

Goldsberry hired attorneys Andrew Jezic, Joseph McKenzie, and John Giannetti, each of a different law firm, to represent him at trial. Before trial, Myers filed a motion to sever his trial from that of Goldsberry. At the hearing on that motion, Myers, through his counsel, Janet Hart, informed the court that attorney McKenzie had spoken previously to Myers regarding the facts of the case. Ms. Hart was not certain of the exact date on which the conversation took place, the purpose of the conversation, whether McKenzie by that time had entered his appearance on behalf of Goldsberry, and whether Myers was represented by counsel at the time. Hart nevertheless alleged that the conversation between her client and McKenzie posed possible violations of Maryland Rules of Professional Conduct 1.18 [1] (pertaining to an attorney's duties to prospective clients) and 4.2 (concerning attorney communi-

---

1. Maryland Rule of Professional of Conduct 1.18 is entitled, "Duties to Prospective Client," and provides:

    (a) A person who discusses with a lawyer the possibility of forming a client-lawyer relationship with respect to a matter is a prospective client.

    (b) Even when no client-lawyer relationship ensues, a lawyer who has had discussions with a prospective client shall not use or reveal information learned in the consultation, except as Rule 1.9 would permit with respect to information of a former client.

    (c) A lawyer subject to paragraph (b) shall not represent a client with interests materially adverse to those of a prospective client in the same or a substantially related matter if the lawyer received information from the prospective client that could be significantly harmful to that person in the matter, except as provided in paragraph (d). If a lawyer is disqualified from representation under this paragraph, no lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation in such a matter, except as provided in paragraph (d).

    (d) Representation is permissible if both the affected client and the prospective client have given informed consent, confirmed in writing, or the disqualified lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom.

cations with a person already represented by counsel).[2] Hart further explained that McKenzie informed her that, after the conversation with Myers, he called the District Court and learned that there was no line of appearance filed on behalf of Myers. Hart noted, however, that the District Court computer system "very often" does not reflect accurately the correct date of the line of appearance.

Hart argued to the trial court that McKenzie's actions prejudiced her client in two ways. First, Myers would be assessing throughout trial whether to testify, and the possibility of McKenzie's cross-examining him would "affect[ ] [Myers's] ability to make a clear, unencumbered decision." Second, if Myers testified and McKenzie cross-examined him, it would "look[ ] wrong" because McKenzie had already discussed the facts of the case with him.[3]

In response, attorney Jezic explained that McKenzie had not entered his appearance for Goldsberry when he spoke with Myers and McKenzie never represented to Myers that he was a "disinterested person." Jezic also noted that the conversation took place before Myers's preliminary hearing date and, after McKenzie informed Jezic of the conversation with Myers, the two took several actions to mitigate any possible rule violations. First, McKenzie, upon learning that Myers was unrepresented, called the District Court and attempted to obtain counsel for Myers. And, second, Jezic and McKenzie never discussed "anything that Mr. Myers said." McKenzie supplemented Jezic's representations, adding that, although he

---

**2.** Maryland Rule of Professional of Conduct 4.2, entitled, "Communication with Person Represented by Counsel," provides in pertinent part:

(a) Except as provided in paragraph (c) [authorizing communication with a government official under certain circumstances], in representing a client, a lawyer shall not communicate about the subject of the representation with a person who the lawyer knows is represented in the matter by another lawyer unless the lawyer has the consent of the other lawyer or is authorized by law or court order to do so.

**3.** We surmise that, by "looking wrong," Hart was suggesting that, should Myers testify and be cross-examined by McKenzie, the resulting interaction not only would be unfair to Myers, but would appear unfair to the jury.

had discussed the facts of the case with Myers, at no time during the conversation did Myers make any admissions. McKenzie also confirmed Jezic's representation to the court that the conversation with Myers took place prior to the indictments of Goldsberry and Myers.[4]

After hearing from both parties on the issue, the trial court found as a fact that the conversation between Myers and McKenzie took place before Myers was indicted. And, based on Jezic's and McKenzie's representations, the court further found that "Mr. McKenzie did not convey to Mr. Jezic the sum and substance ... or any summary, for that matter, of any conversation [Mr. McKenzie] had with Mr. Myers." The court stated: "It's clear that Mr. McKenzie did not know that anybody was representing Mr. Myers when he talked to him, and the reality is there's absolutely nothing wrong with an attorney, who may be representing a co-defendant, trying to communicate with the other defendant if that defendant is not represented." The court denied the motion for severance and, instead, imposed restrictions on McKenzie's involvement in the trial. The court stated:

> Very simply, Mr. Jezic, you represent [Goldsberry], and Mr. McKenzie is not representing him anymore. The reality is that there's been absolutely no prejudice to [Goldsberry], but the reality is that—you can and, Mr. McKenzie, you can step back from the trial table, but the reality is—and you can consult with Mr. Jezic during the course of the trial, but we're going to keep this trial going forward wherein there's no taint whatsoever.

Jezic objected. He argued that, because Goldsberry desired McKenzie's continued presence at the trial table, the restriction on McKenzie's involvement violated Goldsberry's Sixth Amendment right to counsel of his choice. The court then modified its ruling, explaining that McKenzie could re-

---

4. The record shows that Goldsberry was indicted on April 18, 2006. The on-line docket entries of Myers's case, of which we take judicial notice, reflect that he was indicted on April 18, 2006.

main at the trial table, but was not to reveal to Jezic anything related to his conversation with Myers.

At that point, the State brought to the trial court's attention a second potential conflict, one that involved McKenzie and Ms. Tawanna Davis, who was scheduled to testify as a State's witness. Ms. Davis, according to the State, had testified before the grand jury that she was "coached" by Goldsberry and McKenzie. The State advised the court that, if Davis "somehow chang[ed] her testimony from what she had told the grand jury," "there might come a point in time where I'm going to ask her if she was coached by an attorney." The court, on hearing that, ruled:

> That's all the more reason [to disqualify McKenzie]. McKenzie put himself in the position of being a possible witness in this case. *So with that in mind, the Court is even more comfortable now than it was two minutes ago with telling Mr. McKenzie that he can't participate in this trial.* So we're not going to take any chances. Mr. McKenzie will not now be sitting at the trial table, not because [Goldsberry] does not want him to, but the reality is he could potentially be a witness in this case.

(Emphasis added.)

Jezic renewed his earlier objection, arguing once again that the restriction on McKenzie's ability to represent Goldsberry violated Goldsberry's Sixth Amendment right to choice of counsel. The court responded that it believed "there's an exception if [McKenzie is] going to be a witness." [5]

---

**5.** As it turned out, Davis was not permitted to testify at trial. An *in camera* hearing was conducted to determine whether Davis's testimony regarding statements made to her by Goldsberry were admissible as statements in furtherance of a conspiracy. It developed at the hearing that Davis would have testified that during a telephone conversation Goldsberry implicated himself and Myers in the shooting. The court barred Davis from testifying in the prosecution's case-in-chief, finding that Goldsberry's alleged statements to Davis were made well after the completion of the alleged conspiracy. For present purposes, it is important to note that absent from the transcript of the hearing is any statement by Davis indicating that she was "coached" by McKenzie.

Trial commenced on January 31, 2007. It is unnecessary, for purposes of the issues we decide here, to recount all that occurred at trial. To set the factual context within which those issues arose, we shall rely on the summary of the underlying facts set forth in the Court of Special Appeals' opinion.[6]

Wendy Braxton, an acquaintance of both Goldsberry and the victim, Vincent Chamberlain, and the sole witness to the attempted robbery and shooting of Mr. Chamberlain, gave an uncontradicted account of the events at trial. Ms. Braxton testified that sometime in March 2006, while visiting Goldsberry, she received a call from Mr. Chamberlain inviting her and Goldsberry to come to Mr. Chamberlain's house to smoke marijuana.

On arriving at the house, Mr. Chamberlain handed Ms. Braxton some marijuana to roll and while doing so, she heard Goldsberry and Mr. Chamberlain discuss selling Mr. Chamberlain's marijuana. The three then proceeded to a field behind the house to smoke some of the marijuana. Ms. Braxton again observed Goldsberry and Mr. Chamberlain conversing as they returned from the field. Ms. Braxton then departed with Goldsberry and dropped him off at his apartment.

Ms. Braxton further testified that Goldsberry called her later that evening to ask questions about Mr. Chamberlain. He asked, in particular, "how long she knew Mr. Chamberlain" and if "he was cool and stuff." Ms. Braxton subsequently received a call from Mr. Chamberlain asking if she wanted to play cards and requesting that she pick him up. On arriving at Mr. Chamberlain's home at approximately 10:00 p.m., Ms. Braxton testified that she saw Goldsberry and another individual parked in front of the house. Goldsberry exited the car and spoke with Mr. Chamberlain outside the house. Ms. Braxton further testified that Goldsberry left in his car, after stating that he had to "go get

---

6. We have supplemented and modified the Court of Special Appeals' summary, where necessary.

something." On returning, Goldsberry proceeded with Mr. Chamberlain to a shed attached to the rear of the house.

Ms. Braxton got out of her car several minutes later and went to the shed to ask Mr. Chamberlain if she could use the bathroom. While at the rear of the house near the shed, Ms. Braxton saw Goldsberry walk towards the front of the house and return with Mr. Myers. Ms. Braxton testified that as Goldsberry and Mr. Myers entered the shed and approached the door leading to the house, Goldsberry drew a gun on Mr. Chamberlain, pointed the gun at Mr. Chamberlain's face, and said "give me the stuff." She then observed Mr. Myers pull a gun from his pocket. Goldsberry repeated "give me the stuff."

Ms. Braxton ran to hide behind a tree in the backyard, where she observed Mr. Myers chasing Mr. Chamberlain. She testified that prior to hearing the gun shot, she saw Mr. Myers pointing the gun at Mr. Chamberlain's head. Ms. Braxton then saw Goldsberry run out of the shed, Mr. Myers run around to the front of the house, and Mr. Chamberlain fall to the ground. After Mr. Myers and Goldsberry fled the scene, Ms. Braxton ran to Mr. Chamberlain and saw blood coming from his head. Unsure of what to do, Ms. Braxton got in her car and left the scene.

As Ms. Braxton was "driving around," Goldsberry called her, asked if she had gone to the police, and requested that they meet. When Ms. Braxton told Goldsberry "I'm not going to meet up with you so that you can kill me like you did Vincent," Goldsberry told her that "I didn't kill him. I didn't know that was going to happen. I just went there to rob him, and James got scared and he killed him." Goldsberry warned her that "snitches get stitches." Ms. Braxton also testified that Goldsberry offered her money, discussed the need "to make up a story," and told her to tell police he was not at the scene.

Fearing for her safety, Ms. Braxton went to stay with a friend. Over the next 72 hours, she was called by Goldsberry "four or five times a day." During those conversations, Goldsberry asked repeatedly where she was and if she had

spoken with the police. Ms. Braxton's family, upon being told by her of what she had witnessed, convinced her that she must inform the police. Three days after the incident, Ms. Braxton went to the police station, where she identified Myers as the "person who shot" Chamberlain and Goldsberry as having been present at the shooting.

*Goldsberry*, 182 Md.App. at 400–02, 957 A.2d at 1114–15.

At the close of the State's case, Goldsberry moved for a mistrial, raising once again the Sixth Amendment counsel of choice argument, and noting that "Mr. McKenzie has not been able to participate in the entire trial" and had been "outside of the courtroom the entire case." The court denied Goldsberry's motion for a mistrial, stating: "I have allowed [ ] Mr. McKenzie to communicate with you [Mr. Jezic] and Mr. Giannetti in terms of representing [Goldsberry]. The fact that he's outside of the courtroom doesn't mean he couldn't communicate, and, obviously, I take note that, apparently, he has been communicating with you." The court further stated that Goldsberry had not been prejudiced during the trial by Mr. McKenzie's absence. Mr. Jezic reminded the court that, because McKenzie had been subject to the rule on witnesses,[7] neither Jezic nor Giannetti had discussed with McKenzie anything related to the evidence adduced at trial. The court replied: "That's not what the Court ruled though. I said he could go ahead and communicate with you. The only thing he couldn't do was tell you what his conversations were with Mr. Myers." The court evidently forgot its earlier admonition to

---

7. Maryland Rule 5–615, entitled "Exclusion of witnesses," provides:

    (a) **In general.** Except as provided in sections (b) and (c) of this Rule, upon the request of a party made before testimony begins, the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses. When necessary for proper protection of the defendant in a criminal action, an identification witness may be excluded before the defendant appears in open court. The court may order the exclusion of a witness on its own initiative or upon the request of a party at any time. The court may continue the exclusion of a witness following the testimony of that witness if a party represents that the witness is likely to be recalled to give further testimony.

defense counsel that Mr. McKenzie has "got to go outside because he may be a potential witness."

At the close of all the evidence, the court gave the following instructions concerning felony murder:

Question number two reads—and this is what we call felony murder. It's different from first degree premeditated murder. Felony murder can be divided into two different degrees. Question two deals with first degree felony murder. That means that each defendant is charged with the crime of felony murder. If your verdict is not guilty on question one [first degree premeditated murder], then you go onto two.

In order to prove the elements of question two, the State must prove that the defendant, or another participating in the crime with that defendant, committed or attempted to commit the underlying felony. The underlying felony in this case is question five, attempted robbery with a deadly weapon. So that's a precursor to question two.

Number two, the second element, is that the defendant, or another participating in the crime, killed the victim, in this case Mr. Chamberlain. That the defendant, or another person participating in the crime, killed the victim.

And, number three, that the act resulting in the death of the victim occurred during the commission of the underlying felony. In this particular case, the underlying crime is the attempted robbery with a deadly weapon. So if the murder occurred during the course of the attempted robbery, that satisfies that element, if proven beyond a reasonable doubt.

It is not necessary for the State to prove that the particular defendant intended to kill the victim. So in the felony murder, the intent to kill is not necessary to prove.

Now, that would be the definition of first degree felony murder, question number two.

If your verdict is not guilty of question number two, then you would go to question number three, which is second degree felony murder. Second degree felony murder means that the defendant, or another participating in the

crime with the defendant, committed or attempted to commit the underlying felony, again, question five, attempted robbery with a deadly weapon.

Element number two, that the way in which the attempted robbery with a deadly weapon was committed or attempted under all circumstances created—and here's the distinction between first degree felony murder and second degree. In second degree felony murder, that attempted robbery with a deadly weapon created a reasonably foreseeable risk of death or serious physical injury likely to result in death. So that act created a reasonably foreseeable risk of death or serious physical injury likely to result in death.

The third element is that, as a result of the way in which the attempted robbery with a deadly weapon was committed, Mr. Chamberlain was killed. That distinguishes second degree felony murder from first degree. But remember, the intent to kill doesn't have to be present for either one.

The court's instruction on the requirement of unanimity was as follows:

Your verdict as to each and every charge, as to each defendant, must be unanimous. Anything short of a unanimous verdict is not acceptable. Unanimous means a 12 to nothing vote. Our two alternates do not deliberate.[8]

During its deliberations, the jury sent a note to the court, stating: "[c]ould you please clarify the difference between first and second degree felony murder." The court repeated the basic elements of first degree and second felony murder, then stated, in pertinent part:

Now, here's where the difference comes in. This is the second element of second degree, and this makes it different from first degree. That the way in which the attempted

---

**8.** The Maryland State Bar Associations Criminal Pattern Jury Instructions ("MPJI–Cr") 2:03 (2005) recommends the following instruction pertaining to unanimity:

Your verdict must represent the considered judgment of each juror and must be unanimous. In other words, all twelve of you must agree.

robbery with a deadly weapon—your question five—was committed—or in this case attempted—under all the circumstances, under all the circumstances [sic], created a reasonably foreseeable risk of death or of serious physical injury likely to result in death.

I'll repeat that one more time. That the manner in which the attempted robbery with a deadly weapon was committed, under all circumstances, created a reasonably foreseeable risk of death or of serious physical injury likely to result in death.

Thereafter the jury convicted Goldsberry of second degree felony murder, attempted robbery with a dangerous weapon, use of a handgun in the commission of a crime of violence, and conspiracy to commit second degree murder.

Prior to sentencing, Goldsberry moved for a new trial. Goldsberry repeated his previous argument that Maryland law does not recognize second degree felony murder based upon the underlying felony of attempted robbery with a dangerous weapon. Thus, in Goldsberry's view, the second degree felony murder conviction could not stand. The court rejected Goldsberry's contention as contrary to Maryland law and denied the motion.

The Court merged the conviction of attempted robbery with a deadly weapon with the second degree felony murder conviction, and sentenced Goldsberry to a 30–year term of imprisonment for second degree felony murder, a 20–year consecutive term of imprisonment for use of a handgun in the commission of a crime of violence, and a 30–year concurrent term of imprisonment for conspiracy to commit second degree murder.

### The Appeal

Goldsberry raised five claims of error before the Court of Special Appeals. *See Goldsberry,* 182 Md.App. 394, 957 A.2d 1110. Of relevance to the issues before this Court, Goldsberry contended that the trial court committed reversible error by: (1) disqualifying McKenzie from representing Goldsberry in violation of the Sixth Amendment right to counsel of choice; (2) submitting to the jury the charge of second degree felony

murder; and (3) instructing the jury that only a unanimous verdict was acceptable. *Id.* at 400, 957 A.2d at 1114.[9]

With regard to the first of those contentions, the Court of Special Appeals, relying on its interpretation of *Wheat v. United States,* 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988), concluded that "the trial court's ruling properly balanced [Goldsberry's] qualified right to counsel against competing factors that weighed against continued unrestricted representation by Mr. McKenzie." *Goldsberry,* 182 Md.App. at 421, 957 A.2d at 1124. The court reasoned that McKenzie's conduct posed two potential ethical violations: McKenzie "could have violated [Rule of Professional Conduct] 1.18" when he spoke with Myers; and there was a "potential violation of [Rule of Professional Conduct] 3.7" ("Lawyers as Witness"), given the State's representation that led the trial court to believe McKenzie could be called as a witness if Tawanna Davis testified at trial, as the State anticipated she might, in a manner inconsistent with her testimony before the grand jury that she had been "coached" by McKenzie. *Id.* at 420, 957 A.2d at 1126. The Court of Special Appeals, though acknowledging that Davis ultimately did not testify, reasoned that the trial court "did not have the benefit of hindsight when it made its ruling." *Id.* at 420, 957 A.2d at 1126.

The Court of Special Appeals also emphasized that Goldsberry was not deprived of his counsel of choice when the court disqualified McKenzie because Goldsberry was still represented by attorney Jezic (and attorney Giannetti), whom he had selected. *Id.* at 421, 957 A.2d at 1126.[10] The court therefore

---

**9.** In addition to the contentions listed, the Court of Special Appeals rejected Goldsberry's claim that the trial court committed reversible error in failing to instruct the jury that it may disbelieve the uncontradicted testimony of Braxton, and granted him relief on his claim that the court erred in submitting to the jury a charge of conspiracy to commit second degree murder. *See Goldsberry,* 182 Md.App. at 423, 957 A.2d at 1127. There is no challenge here to either of those holdings.

**10.** The Court of Special Appeals observed in this regard: "In addition, [Goldsberry] was not deprived of his right to counsel of choice. [Golds-

held that the trial court was within its discretion "in determining that [Goldsberry's] right to counsel of choice was outweighed by the countervailing interests of fairness, maintaining ethical standards, and avoiding conflicts of interest." *Id.* at 420, 957 A.2d at 1126.

As for the second contention, the Court of Special Appeals agreed with Goldsberry that second degree felony murder predicated upon attempted armed robbery is a "nonexistent" crime under Maryland law. *Id.* at 402, 957 A.2d at 1116. Accordingly, the Court of Special Appeals held that the trial court erred in instructing the jury on second degree felony murder and, presumably, sending that charge to the jury. The Court of Special Appeals held that the second degree murder conviction must be reversed without the possibility of a retrial on the charge of felony murder. *Id.* at 400, 957 A.2d at 1115.

The Court of Special Appeals began by explaining, in reliance on *Fisher v. State,* 367 Md. 218, 786 A.2d 706 (2001), that the purpose of Maryland's statutory scheme, which divides murder into degrees, is to differentiate severity of punishment. *Id.* at 404–05, 957 A.2d at 1116. The Court then noted the distinction between first and second degree felony murder. First degree felony murder, explained the Court, requires a homicide that occurs in the commission, or attempted commission, of one of the felonies listed in Maryland Code (2002 Repl.Vol., Supp.2009), § 2–201 of the Criminal Law Article ("CrL") (providing in (a), inter alia, that "[a] murder is in the

---

berry] was still represented by Mr. Jezic—whom he selected—and the trial court's ruling permitted Mr. McKenzie to assist in [Goldsberry's] defense by consulting with Mr. Jezic and Mr. Giannetti as long as they did not discuss the conversation with Mr. Myers." 182 Md.App. at 420–21, 957 A.2d at 1126. We have two concerns with those statements: First, we read the record differently insofar as concerns the trial court's limitation on McKenzie's representation of Goldsberry. As we see it, the trial court, though going back and forth on this point, in fact disqualified McKenzie altogether when the court said "Mr. McKenzie [ ] can't participate in this trial." Second, we disagree, for reasons that we discuss, *infra,* that Goldsberry's right to counsel of choice was not prejudiced by the disqualification of McKenzie.

first degree if it is ... (4) committed in the perpetration of or an attempt to perpetrate: ... (ix) robbery under § 3–402 or § 3–403 of this article[,]" and providing in (b) that the punishment, generally, "shall be ... imprisonment for life"). Second degree felony murder is predicated upon a felony that, although not listed in CrL § 2–201(a)(4), is by its nature or the way in which it is perpetrated sufficiently dangerous to life. *Goldsberry*, 182 Md.App. at 407, 957 A.2d at 1117 (citing *Roary v. State*, 385 Md. 217, 867 A.2d 1095 (2005)); *see also* CrL § 2–204(a), (b) (providing that "[a] murder that is not in the first degree under § 2–201 of this subtitle is in the second degree[,]" punishable by "imprisonment not exceeding 30 years"). The Court of Special Appeals reasoned that, because armed robbery with a dangerous weapon is listed in CrL § 2–201(a)(4)(ix) as a predicate for first degree felony murder, it "may not also support a charge of second degree felony murder, regardless of the circumstances or manner of its commission." *Id.* at 407, 957 A.2d at 1118. The Court therefore concluded that the trial court erred in instructing the jury on the charge of second degree felony murder.

The Court of Special Appeals found additional error in the trial court's re-instruction on the subject in response to the jury's request for further instruction distinguishing first from second degree felony murder. The trial court instructed that the difference between the two degrees was whether "the attempted robbery with a deadly weapon created a reasonably foreseeable risk of death or of serious physical injury likely to result in death." Citing *Fisher*, 367 Md. at 250, 786 A.2d at 706, the Court of Special Appeals explained that the instruction was improper because a reasonably foreseeable risk of death is required for the felony murder doctrine to be applicable in the first place and thus has "no bearing on the degree of punishment." *Goldsberry*, 182 Md.App. at 407, 957 A.2d at 1118.

The Court of Special Appeals also agreed with Goldsberry that the trial court's jury instruction regarding unanimity was coercive and erroneous. *Id.* at 417, 957 A.2d at 1124. We need say nothing more about that holding because, as we

mentioned at the outset, the State's challenge to that holding, though one on which we granted certiorari, does not need to be addressed in light of our disposition of this appeal.

The State petitioned this Court for further review of the judgment, as did Goldsberry, by way of cross-petition. We granted the State's petition to address two questions:

> To the extent preserved, did the Court of Special Appeals err in reversing and remanding for a new trial on the ground that the trial court's modified unanimity instruction could have coerced the deliberative process?

> Did the Court of Special Appeals err by ruling that the trial court should not have given the pattern jury instruction on second degree felony murder when the felony underlying the murder is an attempted robbery with a dangerous weapon?

We granted Goldsberry's cross-petition to address the following question:

> Did the lower courts deprive Goldsberry of his constitutional right to counsel of his choice by effectively disqualifying one defense attorney?

We hold that Goldsberry is entitled to a new trial on the ground that the trial court violated Goldsberry's right under the Sixth Amendment to his counsel of choice by disqualifying attorney McKenzie from the defense team. We further hold, for reasons we shall explain, that the State may re-try Goldsberry on the charge of felony murder subject to the limitations (which we shall outline) that are demanded by the peculiar circumstances of this case.

## II.

### *The Sixth Amendment Claim*

#### A.

The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." The right to counsel includes the right of a defendant, who does not require court-

appointed counsel, to select the counsel of his or her choosing. *See Wheat,* 486 U.S. at 159, 108 S.Ct. 1692; *Gonzales v. State,* 408 Md. 515, 530, 970 A.2d 908, 916 (2009); *McCleary v. State,* 122 Md. 394, 400, 89 A. 1100, 1103 (1914). *Cf. Powell v. Alabama,* 287 U.S. 45, 53, 53 S.Ct. 55, 77 L.Ed. 158 (1932) ("It is hardly necessary to say that, the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice.").

The right to counsel of choice, however, is qualified. It is subject to the trial court's "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat,* 486 U.S. at 160, 108 S.Ct. 1692; *accord Moore v. State,* 390 Md. 343, 405, 889 A.2d 325, 362 (2005) (stating that a defendant's right to counsel of choice "will not be permitted to frustrate[ ] the [ethical and] orderly administration of criminal justice"). This right to counsel, though protected by a presumption in favor of a defendant's counsel of choice, can be overcome. *Wheat,* 486 U.S. at 164, 108 S.Ct. 1692. The presumption can be overcome if, for example, the defendant's attorney "has a previous or ongoing relationship with an opposing party." *Id.* at 159, 108 S.Ct. 1692. And it can be overcome, "not only by a demonstration of actual conflict but by a showing of a serious potential for conflict." *Id.* at 164, 108 S.Ct. 1692.

The facts of *Wheat* presented the Supreme Court with the opportunity to explicate these principles. The Court had before it the question whether the federal district court had erred in refusing to permit Wheat to waive his right to conflict-free counsel and obtain representation by an attorney who represented several co-defendants. 486 U.S. at 154, 108 S.Ct. 1692. Wheat and numerous co-defendants had been charged with participating in a drug distribution conspiracy. Two of those co-defendants, Gomez–Barajas and Javier Bravo, were represented by attorney Eugene Iredale. Iredale had obtained on behalf of Gomez–Barajas an acquittal with respect to the drug distribution charges and a subsequent plea deal on

unrelated charges that, at the time of the relevant events in Wheat's case, had not yet been accepted by the district court. Iredale also negotiated a plea deal for Bravo. *Id.* at 155, 108 S.Ct. 1692. Wheat, evidently impressed by those results, contacted Iredale to request his representation. At the conclusion of Bravo's guilty plea proceeding, Iredale informed the district court of Wheat's request to have Iredale represent him at his upcoming trial. *Id.*

The district court, prompted by the Government's suggestion that the proposed representation would pose a potential conflict, conducted a hearing to decide the issue, one day before Wheat's trial was scheduled to commence. The Government objected on two grounds to Iredale's representation of Wheat at his trial while the plea deal for Gomez–Barajas remained pending. *Id.* First, the dual representation posed a potential conflict given the possibility that Gomez–Barajas's plea would be rejected by the district court, resulting in a trial during which Wheat might be called by the Government to testify against Gomez–Barajas. *Id.* at 155, 108 S.Ct. 1692. Should that happen, ethical strictures would prevent Iredale from cross-examining Wheat, thereby rendering Iredale's representation of Gomez–Barajas ineffective. Second, the dual representation posed a separate potential conflict because, as part of Bravo's plea deal, he agreed to testify against Wheat at Wheat's trial. *Id.* at 156, 108 S.Ct. 1692. Given the Rules of Professional Responsibility, Iredale would be unable to cross-examine Bravo, rendering ineffective his representation of Wheat.

Wheat responded that his right under the Sixth Amendment to counsel of his choice entitled him to waive his right to conflict-free counsel. He disputed the Government's concern as posing "highly improbable" conflicts that were "manufactured" to disqualify Iredale. Wheat also noted that he, Gomez–Barajas, and Bravo all had waived any potential claims of conflict of interest. *Id.* at 156–57, 108 S.Ct. 1692.

The district court denied Wheat's request for substitution of Iredale as his counsel on the ground that the joint representa-

tion would pose an irreconcilable and un-waivable conflict. Wheat proceeded to trial, represented by his original counsel, and was convicted of conspiracy to distribute marijuana and related offenses. Wheat appealed, arguing, among other claims, that the district court's ruling deprived him of his constitutional right to counsel of choice. The Court of Appeals for the Ninth Circuit disagreed and affirmed the judgments. *United States v. Wheat*, 813 F.2d 1399 (9th Cir.1987).

The Supreme Court affirmed. The Court began its analysis with the recognition that the Sixth Amendment right to counsel includes the right to choose one's own counsel. The Court explained that "the essential aim" of the Sixth Amendment is to "guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat*, 486 U.S. at 159, 108 S.Ct. 1692. The right to choose one's counsel nevertheless may be circumscribed by a trial court when necessary to uphold "the ethical standards of the profession" and to ensure that "legal proceedings appear fair to all who observe them." *Id.* at 160, 108 S.Ct. 1692. In other words, the right to choice of counsel is not absolute: one may not select an unbarred advocate or an attorney about whom a "court justifiably finds an actual [or a serious potential for a] conflict of interest[.]" *Id.* at 162., 108 S.Ct. 1692

It is in the latter context, noted the Supreme Court, that the "likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict," requiring the trial court to act without the benefit of a fully developed record produced at trial. *Id.* at 162, 108 S.Ct. 1692. For this reason, the trial court is afforded "substantial latitude in refusing waivers of conflicts of interests." *Id.* at 163, 108 S.Ct. 1692. The Court determined that the proper balance is struck when "the district court [ ] recognize[s] a presumption in favor of [the defendant's] counsel of choice," which "may be overcome not only by a demonstration of actual conflict but *by a showing of a serious potential for conflict.*" *Id.* at 164, 108 S.Ct. 1692 (emphasis added).

Courts applying *Wheat* have grappled with what that case requires of a trial court in making the important and weighty assessment presented by a choice of counsel issue. *United States v. Nolen,* 472 F.3d 362 (5th Cir.2006) is illustrative. In that case, Nolen, a persistent "tax protestor," was charged in the United States District Court for the Eastern District of Texas with three counts of willfully attempting to evade federal income taxes. *See id.* at 369. After being represented by several different attorneys throughout pre-trial proceedings, Nolen hired John Green to represent him. *See id.* at 370. Green was admitted pro hac vice.

In a motion for continuance, Green referred to the magistrate judge, who had presided over preliminary matters in which Green was not involved, in a manner that, in the district court's view, implicated Texas Disciplinary Rule 8.02.[11] *Nolen,* 472 F.3d at 370. The district court ordered a show cause hearing and, at that proceeding, revoked Green's pro hac vice admission. *Id.* Nolen was later convicted of willful tax evasion.

On appeal, Nolen argued successfully that the district court committed reversible error by failing to "to balance the need to enforce [ethical rules] against Nolen's Sixth Amendment Right to counsel of choice." *Id.* at 371. The Fifth Circuit explained that a criminal defendant's choice of counsel may be disqualified for an ethical violation only if, " 'in light of the interests underlying the standards of ethics, the social need for ethical practice outweighs the party's right to counsel of his choice.' " *Id.* at 375 (quoting *United States v. Kitchin,* 592 F.2d 900, 903 (5th Cir.1979)). Therefore, "[c]onducting such a balancing test is thus a prerequisite to disqualifying counsel of defendant's choice, *and explicating the process on the record is a pre-requisite to appellate review." Nolen,* 472 F.3d at 375 (emphasis added). Turning to the district court's order revok-

---

**11.** Texas Disciplinary Rule 8.02 states, in pertinent part, that "[a] lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge. . . ."

ing attorney Green's pro hac vice admission, the *Nolen* Court found no indication that the district court had conducted the necessary balancing test and, accordingly, concluded that the district court abused its discretion in revoking Green's admission. *Id.* at 376.

*Fuller v. Diesslin*, 868 F.2d 604 (3d Cir.1989) is to like effect. Fuller was convicted of various drug-related offenses following a trial before the New Jersey Superior Court. In a pre-trial motion, Fuller requested, through local counsel, that he be represented pro hac vice by two out-of-state attorneys. *Id.* at 605. That request was denied based on the trial court's belief that local counsel was competent, the "case was going to be hotly contested," and the out-of-state attorneys would create "probable delay ... so grave as to overcome the unfettered right of a defendant to counsel of his own choosing...." *Id.* at 605–06. In his collateral attack of the convictions, Fuller maintained that the trial court arbitrarily denied him the constitutional right to counsel of choice. *Id.* at 606.

The Third Circuit agreed. That court noted that a trial court, when confronted with a choice of counsel issue, must conduct a hearing to " 'make specific findings of fact consistent with the evidence[.]' " *Id.* at 608 (quoting *United States v. Romano*, 849 F.2d 812, 820 (3d Cir.1988) (finding that district court's summary denial of defendant's requested counsel violated right to counsel of choice)). Looking to the trial court's denial of Fuller's request for counsel pro hac vice, the Third Circuit concluded that "the trial court's wooden approach and its failure to make record-supported findings balancing the right to counsel with the demands of the administration of justice resulted in an arbitrary denial of" the right to choice of counsel. *Fuller*, 868 F.2d at 611. The *Fuller* Court was careful to explain, though, that its holding did not "militate" against the broad discretion afforded a trial court as discussed in *Wheat*, but, instead, simply made plain that only "[u]pon obtaining sufficient information" is the court equipped to exercise its discretion, "instinct[,] and judgment based on experience." *Id.* (internal quotation marks and citation omitted).

Other courts have addressed with specificity the steps to be undertaken by a trial court in assessing choice of counsel issues. The Illinois Supreme Court did so in *People v. Ortega,* 209 Ill.2d 354, 283 Ill.Dec. 530, 808 N.E.2d 496 (2004). In *Ortega,* the facts of which are irrelevant for present purposes, the Supreme Court of Illinois suggested the following framework, based on *Wheat:* The trial court must first determine whether there is "actual or serious potential for conflict." *Ortega,* 283 Ill.Dec. 530, 808 N.E.2d at 502. If the court finds a conflict, it must then determine whether the presumption favoring one's counsel of choice is overcome by the interests of fairness and maintenance of ethical standards implicated by the conflict. *Id.* (citing *Wheat,* 486 U.S. at 160, 108 S.Ct. 1692). In conducting this balancing test, the court may consider the following, among all other factors relevant to the conflict: the likelihood that defense counsel will have divided loyalties; the State's right to a fair trial; the appearance of impropriety should the jury learn of the conflict; and the likelihood that defense counsel's continued representation will provide grounds for overturning the conviction. *Id.* Connecticut follows an approach similar to that of the Illinois Supreme Court. *See State v. Peeler,* 265 Conn. 460, 828 A.2d 1216, 1225 (2003) (citing *Fuller* for this proposition and stating that "the trial court cannot vitiate [the right to counsel of choice] without first scrutinizing closely the basis for the claim").

■ We adopt the approach to this issue taken by the Illinois and Connecticut courts, as it is well-grounded in the principles announced in *Wheat* and applied in *Nolen* and *Fuller.* We hold that, before a trial court is permitted to disqualify a criminal defendant's privately obtained counsel (regardless of whether counsel is the defendant's only attorney or one of several on the defense team), the court must conduct a hearing on the matter, "scrutinize closely the basis for the claim," *Peeler,* 828 A.2d at 1225, and make evidence-based findings to determine, based on factors such as those outlined in *Ortega,* 283 Ill.Dec. 530, 808 N.E.2d at 502, whether there is "actual or serious potential for conflict" that overcomes the presumption the defendant has to his or her counsel of choice.

The record must reflect that the trial court contemplated relevant factors in conducting the test that balances the right to one's counsel of choice against the necessity to uphold "the ethical standards of the profession" that ensure that "legal proceedings appear fair to all who observe them." *See Wheat,* 486 U.S. at 160, 108 S.Ct. 1692; *Fuller,* 868 F.2d at 608, 611. With this legal framework in mind, we turn to the parties' arguments.

## B.

Goldsberry argues that the evidence of the two purported ethical conflicts relied upon by the trial court to disqualify McKenzie—his conversation with Myers before trial and McKenzie's alleged coaching of Davis—"was too sketchy" to justify disqualification under *Wheat* and its progeny. Goldsberry first directs us to the record pertaining to McKenzie's conversation with Myers, which Myers's counsel suggested posed potential violations of Maryland Rules of Professional Conduct 4.2 and 1.18. Goldsberry maintains that the evidence presented to the court did not support a finding of a potential violation of either rule of professional conduct.

Goldsberry points out that Rule 4.2 prohibits an attorney, while engaged in the representation of a client, from "communicat[ing] about the subject of the representation with a person who the lawyer knows is represented in the matter by another lawyer...." He argues, based on the representations made to the trial court, all of which indicated that Myers was not represented by counsel at the time he spoke with McKenzie, that the record does not support a potential transgression of Rule 4.2.

Turning to Rule 1.18, Goldsberry emphasizes that the Rule applies only to a "prospective client," defined as "[a] person who discusses with a lawyer the possibility of forming a client-lawyer relationship with respect to a matter...." Goldsberry contends that there is no indication in the record that Myers and McKenzie discussed anything that would implicate Rule 1.18. To the contrary, argues Goldsberry, the only representa-

tions made to the trial court on this point indicate that McKenzie and Myers discussed only the facts of the case and Myers made no admissions to McKenzie.

Goldsberry next attacks the Court of Special Appeals' determination that there was "a potential violation of [Rule] 3.7," given the State's representation that Tawanna Davis (a potential State's witness) had testified before the grand jury that McKenzie had "coached" her.[12] Rule 3.7 prohibits a lawyer from representing a client in a trial in which the attorney is "likely to be a necessary witness. . . ." Goldsberry asserts that there was insufficient information presented to the trial court to allow the court to determine "a compelling need" for McKenzie to testify. Goldsberry argues that "any scenario by which Mr. McKenzie could have become a 'necessary witness' [ ] as a result of 'coaching' Ms. Davis was a remote and speculative one." According to Goldsberry, the record before the trial court lacks the sort of inquiry necessary to decide, with regard to Rule 3.7, whether to honor a defendant's choice of counsel. Other than the "conclusory" representation made by the State, argues Goldsberry, there was no proffer made nor testimony taken to indicate what, if anything, McKenzie said to Davis. Moreover, the trial court did not require the State either to proffer what McKenzie's testimony would be if called as a witness or to demonstrate that "there was no feasible alternative to calling Mr. McKenzie to the stand." Goldsberry suggests that, had the trial court required the State to make these showings, the parties could have fashioned an alternative to McKenzie's being called as a witness, such as a stipulation concerning the conversation between McKenzie and Ms. Davis. Goldsberry alleges that the trial court made its decision based on a "purely hypothetical change in [Ms. Davis's] testimony."

---

**12.** Neither Myers's counsel nor anyone else mentioned the applicability of Rule of Professional Conduct 3.7 at trial. The Court of Special Appeals, however, relied on Rule 3.7, in upholding the trial court's ruling.

Goldsberry refers us to various cases, the notable ones of which we have discussed at length above, in support of his argument that the trial court failed to employ the analysis required when confronted with the decision whether to deprive a defendant of his or her chosen counsel. Goldsberry contends, in particular, that the trial court failed to conduct a sufficient threshold level of evidentiary inquiry into the alleged conflicts, which, if undertaken, would have enabled the proper balancing of Goldsberry's right to counsel of choice on the one hand, and the interests of fairness, avoidance of conflicts, and maintenance of ethical standards on the other. Because the trial court failed to conduct such an inquiry, contends Goldsberry, the presumption of counsel of one's choice was not overcome, and McKenzie's disqualification constituted structural error under *United States v. Gonzalez–Lopez*, 548 U.S. 140, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006) (holding that the denial of counsel of choice is structural error such that prejudice is presumed).

The State, not surprisingly, urges us to affirm the Court of Special Appeals' holding on this issue. The State contests Goldsberry's characterization of the record as "sketchy." In the State's view, the record "adequately established the potential conflicts of interest and ethical violations committed by Mr. McKenzie prior to trial." The State argues that, consistent with the reasoning employed by the Supreme Court in *Wheat*, 486 U.S. 153, 108 S.Ct. 1692, the trial court was well within its considerable discretion in finding that McKenzie's conduct posed "a serious potential for conflict." (Quoting *Wheat*, 486 U.S. at 164, 108 S.Ct. 1692).

Turning to McKenzie's conversation with the co-defendant Myers, the State contends that, given the breadth of conduct prohibited by Rule 1.18, there was a sufficient showing of a potential violation of that Rule. This is so, argues the State, even though the record "does not disclose the substance of that conversation." The State explains that, pursuant to Rule 1.18, a prospective client includes a person who discusses with a lawyer the possibility of forming an attorney-client relationship with respect to a matter. The State, though it does not

expressly say so, presumably contends that, based on the representations made by attorneys Hart, Jezic, and McKenzie, there was enough in the record to afford Myers the protections provided to prospective clients.

The State implies that prospective-client status for Myers would be significant for two reasons. First, under Rule 1.18(a), even though McKenzie and Myers never formed an attorney-client relationship, McKenzie is prohibited from using any information he learned during the consultation with Myers, absent Myers's informed consent or an applicable exception to confidentiality. Second, Rule 1.18(c) and (d) are implicated because McKenzie, who presumably obtained information harmful to Myers during their conversation, would be representing Goldsberry, whose interests are "materially adverse" to Myers.

With regard to McKenzie's alleged "coaching" of the potential State's witness, Tawanna Davis, the State concedes "that the record does not disclose the substance of that conversation [between McKenzie and Davis]." The State notes, however, that the prosecutor's representation to the trial court (*i.e.*, that Davis testified before the grand jury that she was coached by McKenzie), suggests that McKenzie told Davis "how to testify, including what to say and what not to say." The State contends that this representation, in and of itself, made McKenzie a potential witness in the case. For these reasons, the State argues that there was "a firm foundation for [the trial court's] decision to exclude Mr. McKenzie."

## C.

We conclude that Goldsberry has the better part of the argument on this issue. The State grounds its argument on the Supreme Court's decision in *Wheat*. Though *Wheat* indeed supports the State's contention that a trial court is afforded discretion in deciding whether a criminal defendant's selection of counsel is permissible given a purported conflict of interest, that discretion does not excuse the trial court's failure to conduct a threshold level of inquiry to determine

whether there was a "serious potential," *Wheat*, 486 U.S. at 164, 108 S.Ct. 1692, that the asserted conflicts existed or would arise.

Moreover, the sparse record in the present case stands in sharp contrast to the facts in *Wheat* suggesting the serious potential for a conflict of counsel. In approving of the district court's exercise of discretion in *Wheat*, the Supreme Court noted that the district court had been confronted, as a result of Wheat's desired substitution of counsel one day before trial, with the proposed representation of "three conspirators of varying stature in a complex drug distribution scheme." *Wheat*, 486 U.S. at 163–64, 108 S.Ct. 1692. Furthermore, the Government advised the district court that, at Wheat's trial, the Government intended to (and in fact did) call Bravo as a witness. *Id.* And, the district court was informed that, should Gomez–Barajas's plea deal collapse, Wheat would "probab[ly]" be called upon to testify at the trial. *Id.* In either of the latter two circumstances, attorney Iredale's joint representation and corresponding ethical obligations to each client would preclude effective representation of all. *Id.* For these reasons, all of which were revealed to the district court at the "conflict" hearing, the Supreme Court concluded that the district court properly denied Wheat's choice of counsel.

Here, the trial court, prompted by representations made first by attorneys Hart, Myers, and Jezic, and then by the State, determined *sua sponte* to deny Goldsberry's choice of counsel. Contrary to the "serious," if not near-certain, potential for conflict posed by Iredale's representation in *Wheat*, the record here of a potential conflict posed by McKenzie's continued representation of Goldsberry is, using his language, "sketchy" at best.

We agree with the Court of Special Appeals that McKenzie's conversation with Myers "could have" violated Rule 1.18. *See Goldsberry*, 182 Md.App. at 420, 957 A.2d at 1126. But the record developed at trial, upon which the trial court rested its decision, does not come close to revealing the "serious potential for conflict," that *Wheat* requires be established

before the trial court may exercise its discretion to deprive a defendant of his or her counsel of choice.[13]

At the hearing on Myers's motion to have his trial severed from Goldsberry's, the trial court was presented with imprecise assertions from Myers's counsel about McKenzie's conversation with Myers. We have mentioned that there were no facts indicating that, at the time of the conversation, Myers was represented by counsel. Moreover, the only information before the trial court concerning the content of the conversation came from McKenzie's representation to the court that Myers related to him only the "facts" of the case, and made "no admissions." The trial court did not ask of McKenzie his intentions in meeting with Myers, *i.e.*, whether he sought Myers to solicit him as a client. Nor did the trial court request from Myers's counsel a proffer concerning the nature of the conversation. Indeed, Myers's counsel, who presumably would have put forth her strongest arguments in an attempt to sever the trials, could only say "I don't know if the purpose of the meeting involves Rule 1.18 and whether it was an attempt to speak with a prospective client or whether it

---

**13.** The Dissent evidently relies on *Lettley v. State*, 358 Md. 26, 746 A.2d 392 (2000), and the authority cited therein, for the proposition that the trial court should be permitted to accept, at face value and without further inquiry, Myers's counsel's assertion that McKenzie had created a serious potential for a conflict by speaking with Myers, when and under the circumstances he did. That authority, though, concerns the situation in which defense counsel himself or herself brings to the trial court's attention counsel's *own* potential or actual conflict of interest, which, in that attorney's view, prevents the attorney from adequately representing his or her client. It is in that context that "judges should normally accept at face value a lawyer's assertion that a conflict of interest exists." (quoting CHARLES W. WOLFMAN, MODERN LEGAL ETHICS, § 8.2 at 416 (1986)).

That situation is not present in the case at bar. Neither do we believe it to be sound policy, much less constitutionally proper, to allow the *Wheat* presumption in favor of counsel of one's choice to be overcome by the trial court's accepting "at face value" and without further inquiry the representation of a co-defendant's counsel or prosecutor that defense counsel might have committed an ethical violation or acted in such a way that might suggest a serious potential for a conflict on the part of defense counsel.

was to interview a co-defendant regarding facts of the case." [14]

Likewise, though Rule 4.2, which prohibits a lawyer from communicating with a person whom the lawyer "knows is represented in the matter by another attorney," was not specifically mentioned by the trial court in its decision to disqualify McKenzie, the court explicitly rejected the possibility of the rule's violation when it found that McKenzie "did not know" whether Myers was represented by counsel.[15] The trial court stated:

> It's clear that Mr. McKenzie did not know that anybody was representing Mr. Myers when he talked to him, and the reality is there's absolutely nothing wrong with an attorney, who may be representing a co-defendant, trying to communicate with the other defendant if that defendant is not represented.

We consider, too, the State's representation to the trial court that the potential State witness, Ms. Tawanna Davis, had testified before the grand jury to being "coached" by McKenzie. The trial court, relying solely on that representation, inferred that McKenzie could be called by the State as a witness. We agree with the Court of Special Appeals that the allegations may have implicated Rule 3.7. But we cannot conclude, based on the record before the trial court, that there was a showing of "serious potential" that McKenzie would be called as a witness. Put simply, the trial court failed to demand of the State the requisite showing to support such a

---

**14.** For an example of a reversal of a trial court's disqualification of defense counsel for failing to balance properly the defendant's Sixth Amendment right to counsel against a potential conflict posed by a putative attorney-prospective client relationship, see *State ex rel. Youngblood v. Sanders*, 212 W.Va. 885, 892, 575 S.E.2d 864, 872 (2002) ("[B]efore disqualification of counsel [due to a prospective attorney-client relationship], the court must satisfy itself from a review of the available evidence, including affidavits and testimony of affected individuals, that confidential information was discussed.").

**15.** The Comments to Rule 4.2 state that "[t]he prohibition on communications with a represented person applies only if the lawyer has actual knowledge that the person in fact is represented in the matter to be discussed."

finding, before relying on it as grounds for disqualifying McKenzie. At a minimum, the court, prior to disqualifying McKenzie, should have conducted an *in camera* hearing to determine the likelihood that the State would be calling Ms. Davis as a witness [16]; and, in that event, whether she would in fact testify to having been "coached" by McKenzie and, if so, what she meant by the term "coach." [17]

To be sure, the trial court's decision to remove attorney McKenzie from the defense team was made, not with "the wisdom of hindsight after the trial has taken place, but in the murkier pretrial context when relationships between parties are seen through a glass, darkly[,]" at which time, "[t]he likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials." *Wheat*, 486 U.S. at 162, 108 S.Ct. 1692. It remains, though, that the record provides no basis upon which to assess the legal correctness of the court's ultimate decision to disqualify McKenzie, because the court did not conduct an adequate threshold inquiry into the circumstances underlying the purported conflicts in order to assess whether there was a serious potential for conflict. *See Fuller*, 868 F.2d at 611; *Ortega*, 283 Ill.Dec. 530, 808 N.E.2d at 502; *Peeler*, 828 A.2d at 1225.

---

**16.** We have mentioned that a subsequent hearing was conducted on the admissibility of certain testimony by Ms. Davis, and the trial court ruled that the State would not be permitted to elicit that testimony. In the end, Ms. Davis did not testify, at all. *See supra* note 5.

**17.** Goldsberry suggests that, under the circumstances presented here, the State was required to demonstrate—in addition to McKenzie being likely called as a witness—that McKenzie's testimony was essential to the State's case and would provide information for which there was no feasible alternative source. Given that the record was insufficient to support a finding of "serious potential conflict" as required by *Wheat*, we need not analyze the case under this more stringent, "compelling need test." *See Flores v. State*, 155 S.W.3d 144, 148 (Tex.Crim.App. 2004); *cf. Venable v. State*, 108 Md.App. 395, 407, 672 A.2d 123, 129 (1996) (holding that the trial court erred when it allowed the State to call defense counsel as a witness without first requiring the State to make a detailed proffer, allowing defense counsel to respond, and considering alternatives).

We therefore hold that the court's failure to develop a factual record that supports its decision to take the undeniably drastic action of disallowing McKenzie as one of Goldsberry's defense attorneys denied Goldsberry his Sixth Amendment right to counsel of his choice.[18] That constitutional violation entitles Goldsberry to a new trial. *See Gonzalez–Lopez*, 548 U.S. at 148, 150, 126 S.Ct. 2557 (holding that, when the court wrongly denies the defendant the "right to be assisted by counsel of one's choice," structural error results and prejudice is presumed).

## III.

### *The Unanimity Instruction*

Our holding that Goldsberry is entitled to a new trial on the ground that he was deprived of his Sixth Amendment right to counsel of his choice obviates the need to address the State's challenge to the Court of Special Appeals' holding that the court erred in giving a coercive jury instruction on the requirement of jury unanimity. *See Goldsberry*, 182 Md.App. at 416–17, 957 A.2d at 1123–24. We therefore decline to address that contention.

## IV.

### *The Felony Murder Conviction*

The State's remaining contention, that the Court of Special Appeals erred in holding that Goldsberry was convicted of a

---

**18.** The Dissent comments that "[t]his Court should not be focusing upon the issue of whether Mr. McKenzie had an actual conflict of interest, 'serious' or otherwise, with either Goldsberry or Myers." We agree with the Dissent that the focus should not be on whether McKenzie had an actual conflict, as that is not the issue the parties briefed or we decide. Rather, the issue is whether the trial court had before it a record sufficient to overcome the presumption in favor of upholding the right to counsel of choice and justify the court's exercise of discretion to disqualify McKenzie. Under *Wheat*, it is not enough for the record to demonstrate a potential for a conflict of counsel; it must demonstrate a "*serious* potential for conflict." 486 U.S. at 164, 108 S.Ct. 1692. For the reasons we have stated, the record falls short of demonstrating that.

"non-existent" crime, *i.e.,* second degree felony murder based on the crime attempted robbery with a dangerous weapon (hereafter attempted armed robbery), is a different matter. *See id.* at 407–08, 957 A.2d at 1117. If the State is correct that the Court of Special Appeals erred in any aspect of that holding, then the State is not foreclosed from re-trying Goldsberry for felony murder. We therefore shall address the contention.

The State's argument, in a nutshell, is: (1) the General Assembly's legislative determination that killing a victim during the commission of an attempted armed robbery supports a conviction of first degree (not second degree) felony murder did not foreclose the jury in this case from finding Goldsberry guilty of felony murder; because (2) the identity of the underlying felony, once proven, relates only to whether the maximum sentence is life (if a first degree felony murder), or thirty years' imprisonment (if second degree felony murder); and therefore (3) the Court of Special Appeals erred in reversing, without the possibility of re-trial, Goldsberry's conviction of what that court characterized as the "non-existent crime[ ]" of second felony degree murder predicated on attempted armed robbery.

We begin our analysis of this contention with what is essentially uncontested: [19] The parties seem to agree that the

---

**19.** To be precise, the State does not concede that the court "erred" in giving the second degree murder instruction and sending that charge to the jury. The State admits, however, that, "[w]hile factually generated by the case, the trial court's instruction on, and the jury's finding of, a reasonably foreseeable risk of death or injury was, legally speaking, unnecessary[.]" The State suggests that the court evidently relied on the "Notes on Use" accompanying the pattern jury instruction for second degree felony murder, MPJI–Cr 4.17.7.2. The notes on use for that pattern instruction include that the trial court should give the instruction when "the defendant is charged with second degree felony murder and the predicate felony is one that is inherently dangerous to human life because of the way in which it was committed." MPJI–Cr 4:17.7.2. The State then suggests:

Justifiably discerning no incompatibility in the "Notes on Use" of both [the first degree felony murder and the second degree felony murder] instructions, and believing, based on the content of the

trial court ought not have instructed the jury on the crime of second degree felony murder and sent that charge to the jury, because the facts developed at trial make out what the General Assembly has characterized as first degree felony murder, *i.e.*, a criminal homicide that occurred during commission of an attempted armed robbery. The parties also agree that the elements of felony murder are determined by Maryland's common law; and that CrL § 2–201 (first degree felony murder) and CrL § 2–204 (second degree felony murder), at least in the present context, have "identical elements." Where the parties part company is on *the effect* of the jury's finding Goldsberry not guilty of the charge of first degree felony murder and guilty of the charge of second degree felony murder.

The State argues that, under the circumstances of this case, the jury's finding Goldsberry guilty of second degree murder, when, if anything, he should have been found guilty of first degree felony murder, does not absolve him of guilt of felony murder. Citing *Fisher*, 367 Md. at 250, 786 A.2d at 725, the State emphasizes that "the common law of Maryland *alone* defines the elements of felony murder" and "alone imposes culpability for felony murder." The State points out the broad description we accorded the offense in *Roary*, 385 Md. at 226,

---

instructions themselves, that the manner of the attempted robbery's commission distinguished first from second degree felony murder, the trial court gave the jury the option to classify Goldsberry's offense in either the first or second degree. Under the instructions as given, the jury convicted Goldsberry of second degree felony murder and not first degree felony murder because the jury believed that the manner in which he attempted the armed robbery "created a reasonably foreseeable risk of death or of serious physical injury," for that was the only content of the court's second degree felony-murder instruction not found in the first degree felony-murder instruction.
It was in this context that the State maintained:
While factually generated by the case, the trial court's instruction on, and the jury's finding of, a reasonably foreseeable risk of death or injury was, legally speaking, unnecessary because the General Assembly has already found as a legislative fact in Section 2–201 that attempted armed robbery is always inherently dangerous, and for that reason warrants the maximum punishment allowed by law as first degree felony murder.

867 A.2d at 1100, where we said that a person commits felony murder when the person's "conduct [brings] about an unintended death in the commission or attempted commission of a felony...." *Id.* (Quoting 2 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 14.5(a) (2d ed.2003)).

The State asserts that the General Assembly's division of common law felony murder into first degree and second degree felony murder creates nothing more than a "penalty scheme." In support of that assertion, the State directs us to *Weighorst v. State,* 7 Md. 442, 451 (1855), where we stated: "The design [of Chapter 138, § 3 of the 1809 Act] was to discriminate in awarding the punishment" for the various forms of murder. The State also reminds us of our predecessors' description of the General Assembly's purpose in enacting the 1809 Act:

"Murder" is here recognized as a general denomination, including offenses differing from each other in their degrees of atrocity, but not in their nature or kind; no attempt is made to explain or modify its meaning or abridge its range. Its common law sense is left unimpaired; the measure of punishment only is sought to be graduated according to the circumstances under which it was committed.

.... This Act of Assembly, now codified, does not create a new crime; it neither adds to nor diminishes the class of cases which constituted murder at common law; nor does it increase the punishment.

*Davis v. State,* 39 Md. 355, 374 (1874). The State argues that more recent precedent of this Court, citing, inter alia, *Fisher,* also mandates its requested result. The State asserts: "This Court has explained that the felony-murder doctrine operates independently to elevate an unintentional killing to murder, only after which do Sections 2–201 and 2–204 [of the CrL] operate to assign a penalty[.]"

The State contends that the Court of Special Appeals' decision is contrary to the General Assembly's intent to impose a "comprehensive scheme" mandating punishment for *all* felony murders; moreover, the decision is illogical, because it

conflicts with the commonsensical notion that an offense that warrants a greater punishment can also warrant a lesser punishment. In that regard, the State points out the "catch-all" quality of CrL § 2-204(a), which provides: "A murder that is not in the first degree under [CrL § 2-201] of this subtitle is in the second degree." Finally, the State concedes that the jury in the present case, by its verdict, limited the court to imposition of a penalty for Goldsberry's crime of felony murder that was not anticipated by the General Assembly. That, however, argues the State, should have only the effect of punishing Respondent to a lesser degree and not of erasing Goldsberry's culpability for the crime.

Goldsberry responds that we should affirm the judgment of the Court of Special Appeals. He agrees with that court's conclusion that the statutory scheme created by Chapter 138, § 3 of the Acts of 1809 imposed two "mutually exclusive" categories of felony murder. He emphasizes that the plain language of CrL §§ 2-201(a) and 2-204(a) provides that certain underlying felonies serve as predicates for first degree felony murder, and that all other felonies, inherently dangerous in nature or by way of commission, support felony murder in the second degree.

We agree with the Court of Special Appeals that, when, as here, the facts make out *only* a charge of first degree felony murder, a trial court errs in instructing the jury on the crime of second degree felony murder. A trial court further errs, as the court did here, by sending the jury to its deliberations with a verdict sheet that presents the jury with the option of finding the defendant guilty of second degree murder. We do not agree, however, that the trial court's errors in the present case, and the jury's verdict flowing from them, lead ineluctably to the conclusion that Goldsberry cannot be re-tried on a charge of felony murder.

The State correctly identifies the effect the General Assembly's enactment of Chapter 138, § 3 of the Act of 1809 had on the common law crime of felony murder. That legislative decision, as we said as early as in *Weighorst*, 7 Md. at 451, and

as recently as in *Roary,* 385 Md. at 230–31, 867 A.2d at 1102–03, did not abrogate the common law crime of felony murder. Rather the Act divided the single, common law offense into two degrees of culpability, for penalty purposes only, dependent solely on the severity of the underlying felony. *See also, e.g., Jackson v. State,* 286 Md. 430, 436, 408 A.2d 711, 715 (1979) (stating that "[t]he doctrine has not been abrogated by statute in this State. The Maryland statutes with respect to murder do not create any new crime, but merely classify murder, as it was known at common law, into degrees. . . . [T]he common law sense is left unimpaired; the measure of punishment only is sought to be graduated according to the circumstances under which it was committed") (internal quotation marks and citations omitted); *Abbott v. State,* 188 Md. 310, 312, 52 A.2d 489, 490 (1947) (same). *Accord Sifrit v. State,* 383 Md. 116, 138, 857 A.2d 88, 100 (2004) (noting that "[t]he crime of murder in Maryland remains a common law offense"); *Mitchell v. State,* 363 Md. 130, 146, 767 A.2d 844, 853 (2001) (same); *Fisher,* 367 Md. at 247–54, 786 A.2d at 723–27 (reviewing the history of CrL §§ 2-201 and 2-204 and concluding that the statutes created only different grades of punishment).

The extensive authority on the subject leads us to conclude that, notwithstanding the errors the court committed in its instructions and on the verdict sheet, the jury's finding that Goldsberry is guilty of felony murder should stand. The verdict unequivocally reflects the jury's finding that Chamberlain was killed during Goldsberry's commission of an attempted armed robbery. Those facts make out the crime of felony murder, and Goldsberry does not argue to the contrary. The only windfall to which Goldsberry is entitled is that, at re-trial, should the jury once again find him guilty of felony murder, the court is bound to impose a sentence no greater than 30 years' imprisonment, the statutory maximum sentence for second degree felony murder.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED IN PART AND AFFIRMED IN PART; CASE REMANDED TO THE COURT OF SPECIAL APPEALS**

WITH INSTRUCTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR A NEW TRIAL CONSISTENT WITH THIS OPINION; PETITIONER TO PAY THE COSTS.

MURPHY, J., Concurs and Dissents.

MURPHY, J., concurring and dissenting.

I agree with the majority that "the jury's finding that Goldsberry is guilty of felony murder should stand," but I dissent from the holding "that the trial court violated Goldsberry's right to counsel of choice." Because I agree with the Court of Special Appeals that "the trial court was well within its bounds to restrict [the Respondent's] qualified right to counsel of choice," I also dissent from the conclusion that this Court does not need to address the issue of whether the Circuit Court's "modified unanimity instruction" was coercive.

As the Court of Special Appeals stated:

Though the potential conflicts in this case were different from those in *Wheat,* **the trial court here similarly acted within its discretion in determining that appellant's right to counsel of choice was outweighed by the countervailing interests of fairness, maintaining ethical standards, and avoiding conflicts of interest. Continued representation of appellant by Mr. Mckenzie could have violated RPC 1.18 and jeopardized Mr. Myers's right to a fair trial.** In addition, Mr. Mckenzie's "coaching" of Ms. Davis made him a possible witness in the case and presented a potential violation of RPC 3.7, prohibiting a lawyer from acting as an advocate in trial where the lawyer is likely to be called as a witness. Though Ms. Davis was ultimately restricted in her testimony, the trial court did not have the benefit of hindsight when it made its ruling. In addition, appellant was not deprived of his right to counsel of choice. Appellant was still represented by Mr. Jezic—whom he selected—and the trial court's ruling permitted Mr. Mckenzie to assist in appellant's defense by consulting with Mr. Jezic and Mr. Giannetti as long as they did not discuss the

conversation with Mr. Myers. Thus, the trial court's ruling properly balanced appellant's qualified right to counsel against competing factors that weighed against continued unrestricted representation by Mr. Mckenzie.

\* \* \*

Further, unlike *Gonzalez–Lopez*, **the trial court here did not err in its interpretation of the ethics rules, but instead correctly assessed that continued unfettered representation of appellant by Mr. Mckenzie created a very real possibility of violations.** Also of note is that fact that in *Gonzalez–Lopez* the defendant was deprived of his only counsel of choice, whereas here appellant was still represented by his co-counsel of choice, Mr. Jezic. Finally, the trial court's decision was not based on Mr. Mckenzie's conduct in a separate matter, as in *Gonzalez–Lopez*, but was instead based on actions *in this case*. Thus, the trial court was well within its bounds to restrict appellant's qualified right to counsel of choice.

182 Md.App. at 420–22, 957 A.2d at 1126–27. (Emphasis supplied). I agree with, and hereby adopt, that analysis.

I disagree with the majority's conclusion that "the record developed at trial . . . simply does not come close to revealing the 'potential for serious conflict' required by *Wheat.*" The record shows that the following transpired immediately before the jury was selected:

[MYERS' COUNSEL]: I was informed yesterday morning by Mr. McKenzie and Mr. Jezic that Mr. McKenzie spoke with my client, Mr. Myers, about the facts of this case on a date that cannot be determined at this point. I do know that in the District Court we entered a line of appearance on or about April 17th stating that I would represent Mr. Myers. **Mr. McKenzie does not know the date on which he went to speak with Mr. Myers about the facts of the case.** After speaking with Mr. Myers about the facts of the case, he then went and called the District Court to see if he was represented.

\* \* \*

That, however, was not done before he went to speak with my client about the facts of the case. And I would note that very often the computer does not reflect the reality of the filing of the line.

I don't actually know the purpose of speaking with Mr. Myers, and I don't actually know the details of the conversation. **I don't know if the purpose of the meeting involves Rule 1.18 and whether it as an attempt to speak with a prospective client or whether it was to interview a codefendant regarding facts of the case.** A detail I also don't know is whether Mr. McKenzie had already entered his line of appearance for Mr. Goldsberry at the time that he went to speak with Mr. Myers.

THE COURT: What relief are you asking for, [Mr. Myers' Counsel]?

[MYERS' COUNSEL]: Well, I think there are a couple of things the Court can do. Of course, the Court may want to hold a hearing to sift out some more details that I don't actually, at this point, know. But, ultimately, I think this does involve Rule 4.2.

Mr. Jezic has explained that he has erected a Chinese wall, but I don't think that my client should have to worry about the foundation and endurance of that wall. I also think that it's going to create, certainly at the very least, an appearance of impropriety as my client decides whether to testify and by whom he will be cross-examined.

So for those reasons I would ask the Court to sever the Myers matter from the Goldsberry matter.

THE COURT: What prejudice is there to your client at this point in time?

[MYERS' COUNSEL]: Well, the ones I just mentioned, that he has had a conversation with Mr. McKenzie about the facts of the case. As he sits here through this trial, he evaluates constantly whether he's going to testify in his own defense, whether he's going to give up that fifth amendment right or not. **I think, at the very least, it certainly looks bad for him to have to make that decision in the context**

of whether Mr. McKenzie is going to cross-examine him, knowing what he has already said about the facts of the case, the subject, the very essence of the cross-examination. So I think it affects his ability to make a clear, unencumbered decision whether to testify or not.

And then the next prong, the next problem is the actual testimony. **Should he decide to take the stand, at the very least it looks wrong for an attorney for a codefendant, who has already talked about the facts of the case, to cross-examine my client if he decides to take the stand.**

Those are problems my client should not have to be encumbered with because of the actions of the codefendant's counsel. He not only needs a fair trial, it needs to look like a fair trial, and I don't think that there's any way to have it be fair and to look fair without separating, severing Mr. Goldsberry's case from Mr. Myers's case.

THE COURT: Mr. McKenzie, what do you want to tell me?

MR. JEZIC: Your Honor, may I first address the Court?

THE COURT: Go ahead, Mr. Jezic.

\*      \*      \*

MR. JEZIC: Just to give the Court more context, Mr. McKenzie had not entered his appearance, in fact, when—

THE COURT: Entered his appearance in what case?

MR. JEZIC: In the Goldsberry case when he spoke to Mr. Myers.

THE COURT: Well, if I tell you that his appearance in the Circuit Court on behalf of Mr. Goldsberry was entered 6–28–06, [y]ou're saying that he spoke with Mr. Myers before that date?

MR. JEZIC: He spoke to Mr. Myers—what Mr. McKenzie remembers is that he spoke to Mr. Myers before the preliminary hearing date. He called me to tell me about the prospective client Mr. Goldsberry. He told me that he had spoken to Mr. Myers. I immediately said, "Mr. McKenzie, you've got to call the Court to find out if a line has been

entered." As you said, he called and he was told a line had not been entered for Mr. Myers.

\* \* \*

THE COURT: Did Mr. Myers have a substantive conversation with you, Mr. McKenzie?

MR. JEZIC: About the facts of the case.

MR. MCKENZIE: What constitutes substantive?

THE COURT: Did you discuss about the chronology or facts in this case?

MR. MCKENZIE: Yes, we did.

THE COURT: Did he make any admissions to you. MR. MCKENZIE: No, Your Honor.

THE COURT: Mr. McKenzie, I would point out, participated in the suppression hearing addressing the issue of identification, as did [Mr. Myers' Counsel], on August 11th of '06. Mr. McKenzie, was there a reason you didn't advise [Myers' Counsel] at that time that you had talked with her client on a prior occasion?

MR. MCKENZIE: At that time I did not know—and I didn't think that there was an obligation to disclose that to her.

THE COURT: Well, clearly, you were representing Mr. Goldsberry at that point in time.

MR. MCKENZIE: Yes, I was.

\* \* \*

MR. JEZIC: There is no malice intended here whatsoever, Your Honor. I don't think there's any alleged malice. He's just a very young attorney. As a matter of fact, he took the responsibility of calling me as soon as he spoke to Myers and Goldsberry.... Clearly, it was not a good idea, but we do not believe there was any violation of the rules of professional responsibility.

\* \* \*

THE COURT: ... [Mr. Myers' Counsel], anything else you want to tell me?

[MYERS' COUNSEL]: I think that the Rule 4.2, I don't think that you can ignore the fact that, in a first-degree murder case, this man is going to have a lawyer. You can't pretend like that's not true, and ignoring that rule because the line hasn't been in the file yet is a very fine distinction, and I think that the prejudice to my client vastly outweighs judicial economy.

THE COURT: All right. What is obviously clear from the record is that Mr. McKenzie spoke with the codefendant Mr. Myers at a date prior to his appearance and that Mr. Jezic's being entered on behalf of Mr. Goldsberry on June 28th of '06. Mr. McKenzie, do you know when you may have talked to Mr. Myers?

MR. MCKENZIE: It was probably towards the latter part of March. It was before they were indicted, possibly very early April.

MR. JEZIC: My understanding is this can be verified.

THE COURT: The bottom line is that there had been charges initiated; he just hadn't been indicted; is that correct?

MR. MCKENZIE: Yes.

THE COURT: From the representations made, it's clear that Mr. McKenzie did not convey to Mr. Jezic the sum and substance—

MR. MCKENZIE: No.

THE COURT:—or any summary, for that matter, of any conversations he had with Mr. Myers.

We know now that [Mr. Myers' Counsel], on behalf of the Public Defender's Office, according to the Circuit Court file, entered her appearance on behalf of the defendant Myers on May 8th.

[MYERS' COUNSEL]: Your Honor, that's a line of appearance for the Circuit Court.

THE COURT: That's all I can go on.

\* \* \*

[MYERS' COUNSEL]: We entered in the District Court. I did the preliminary hearing for Mr. Myers. There is no line from the District Court case in the Circuit Court. I have my line. It's not stamped, but it shows that we sent it to the prosecutor's office on April 17th.

There's another matter that may well arise at trial regarding Mr. McKenzie—

THE COURT: Here is what the Court is going to do. Very simply, Mr. Jezic, you represent Mr. Goldsberry, and Mr. McKenzie is not representing him anymore. Just as simple as that. This is not a problem. The reality is that there's been absolutely no prejudice to Mr. Goldsberry, but the reality is that—and, Mr. McKenzie, you can step back from the trial table, but the reality is—and you can consult with Mr. Jezic during the course of the trial, but we're going to keep this trial going forward wherein there's no taint whatsoever.

MR. JEZIC: Your Honor, may I put one thing on the record?

THE COURT: Yes, sir, Mr. Jezic.

MR. JEZIC: I apologize. It's back at the trial table. May I get my folder real quick? Have a cite to give. It will be very brief.

THE COURT: You can give that to me later.

MR. JEZIC: Just to put it on the record, my objection, Your Honor, is that the recent Supreme Court case in 2006, in June, was about the sixth amendment right to counsel. The Supreme Court ruled that the defendant has an absolute right to counsel of choice, and it did involve the judge weighing a potential violation of the rules of professional responsibility versus the sixth amendment. My client has indicated to me this morning that he would like Mr. McKenzie to remain at the trial table and that is our objection.

THE COURT: Well, the reality is, if he remains at the trial table, he can remain at the trial table. I don't have a problem with that.

I'm just going ahead and pointing out that there should not be any communication between you, Mr. Jezic, and you, Mr. McKenzie, regarding the conversations that may have been made by Mr. Myers to Mr. McKenzie. This isn't a basis for a severance.

\* \* \*

MR. TEFERI: **A witness by the name of Tawanna Davis, who you instructed to come back today, gave grand jury testimony. If she somehow changes her testimony from what she had told the grand jury—and if I have to go line by line—there might come a point in time where I'm going to ask her if she was coached by an attorney. She told the grand jury that she was coached by one Mr. Goldsberry and also Mr. McKenzie before she went to that grand jury. I just wanted to put that on the record.**
THE COURT: That's all the more reason. **Mr. McKenzie has put himself in the position of being a possible witness in this case.** So with that in mind, the Court is even more comfortable now than it was two minutes ago with telling Mr. McKenzie he can't participate in this trial.

So we're not going to take any chances. Mr. McKenzie will not now be sitting at trial table, not because Mr. Goldsberry doesn't want him to, but the reality is he could potentially be a witness in this case.
MR. JEZIC: Okay, Your Honor, we understand. We just continue the objection. Thank you.
THE COURT: I think there's an exception if he's going to be a witness. The other point, there's a motion for severance. It's denied on that basis.

(Emphasis supplied).

As to the suggestion that the Circuit Court should have required an explanation for Mr. McKenzie's visit and/or what he and Mr. Myers discussed during the visit, in *Lettley v. State,* 358 Md. 26, 746 A.2d 392 (2000), this Court quoted with approval the following analysis:

[I]f the lawyer is required to supply a sufficiently detailed basis for his or her concern about the need to cross-examine

or the need to refuse to do so, that also creates a serious risk of exposing confidential communications of one or both clients. The absence of any clearly correct course of action in such a case suggests ... that judges should normally accept at face value a lawyer's assertion that a conflict of interest exists.

CHARLES W. WOLFMAN, MODERN LEGAL ETHICS, § 8.2 at 416 (1986) (footnote omitted). Moreover, in making the required "threshold level of evidentiary inquiry into the alleged conflicts," the trial court is obligated to respect all applicable privileges. In the case at bar, the Circuit Court could not (1) compel Mr. Myers to testify about his conversation with Mr. McKenzie, or (2) compel Mr. McKenzie to testify about his conversation with Mr. Myers.

It is of no consequence that Mr. McKenzie's potential for serious conflict was brought to the Circuit Court's attention by Mr. Myers' trial counsel. In *Lettley, supra*, this Court stated:

In [*Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978) ], defense counsel represented to the trial court that he had received confidential information from one client that would interfere with his ability to examine his other clients on the witness stand. *See id.* at 476–78, 98 S.Ct. 1173. The state argued that "unscrupulous defense attorneys might abuse their 'authority,' presumably for purposes of delay or obstruction of the orderly conduct of the trial." *Id.* at 486, 98 S.Ct. 1173. The Court rejected this view, stating that courts should credit such representations of defense counsel. The Court observed that an attorney representing two clients "is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial." *Id.* at 485, 98 S.Ct. 1173 (citation and internal quotation marks omitted). The Supreme Court commented that "since the decision in *Glasser* [*v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942) ], most courts have held that an attorney's request for the appointment of separate counsel, based on his representations as an officer of the court regarding a conflict of interests, should be

granted." *See id.* Attorneys' representations are trustworthy, the Court reasoned, because "attorneys are officers of the court, and when they address the judge solemnly upon a matter before the court, their declarations are virtually under oath." *Id.* at 486, 98 S.Ct. 1173 (citation and internal quotation marks omitted). **"When a considered representation regarding a conflict in clients interests comes from an officer of the court, it should be given the weight commensurate with the grave penalties risked for misrepresentation."** *Id.* at 486 n. 9, 98 S.Ct. 1173.

*Id.* at 46–47, 746 A.2d at 404. (Emphasis supplied).

The first sentence in the COMMENT to Rule 3.7 of the Maryland Lawyers' Rules of Professional Conduct (RPC) states: "Combining the roles of advocate and witness can prejudice the tribunal and the opposing party and can also involve a conflict of interest between the lawyer and client." I am certain that, like Mr. Jezic and Mr. Giannetti, Mr. McKenzie is an ethical practitioner who would not knowingly violate any Maryland Lawyers' Rules of Professional Conduct. I am equally certain, however, that Mr. McKenzie's visit to Mr. Myers was more than merely "not a good idea." By discussing the "facts of the case" with Mr. Myers, Mr. McKenzie created the **potential** for a serious conflict between himself and the Respondent.

In *Rubin v. Gee,* 292 F.3d 396, 401–02 (4th Cir.2002), *cert. denied, Gee v. Rubin,* 537 U.S. 1048, 123 S.Ct. 637, 154 L.Ed.2d 523 (2002), the United States Court of Appeals for the Fourth Circuit affirmed the decision of the United States District Court for the District of Maryland to grant federal habeas corpus relief to Lisa Joyce Rubin,[20] whose murder conviction had been affirmed by this Court in *Rubin v. State,* 325 Md. 552, 602 A.2d 677 (1992). The federal courts concluded that she was entitled to a new trial on the ground that she had not received "conflict-free representation" from two lawyers on her defense team who, "to avoid criminal indictment

---

**20.** 128 F.Supp.2d 848 (D.Md.2001) is the citation to the opinion of the federal district court.

and keep their conduct from coming to light, . . . took cover as part of the defense team." 292 F.3d at 398.

While it is clear that the case at bar is not one in which Mr. McKenzie was attempting to "take cover as part of the defense team," it is equally clear that the Respondent's right to "conflict-free representation" would have been impaired by the defense team's decision to employ a particular litigation strategy for purposes of reducing the chances that Mr. McKenzie might be accused of violating a Rule of Professional Conduct. The COMMENT to RPC 1.18 cautions that, "[i]n order to avoid acquiring disqualifying information from a prospective client, a lawyer considering whether or not to undertake a new matter should limit the initial interview to only such information as reasonably appears necessary for that purpose." In the case at bar, however, it is clear that Mr. McKenzie and Mr. Myers discussed "the chronology or facts in this case[.]"

Under these circumstances, if Mr. McKenzie was acting as the Respondent's lawyer when he visited Mr. Myers, it is obvious that Mr. McKenzie was a potential witness. On the other hand, if Mr. McKenzie visited Mr. Myers to discuss the possibility of forming a lawyer-client relationship, even though no client-lawyer relationship ensued, Mr. McKenzie was prohibited by RPC 1.18(b) from revealing "information learned in the consultation," and was prohibited by RPC 1.18(c) from representing the Respondent "in the same or a substantially related matter if [Mr. McKenzie] received information from [Mr. Myers] that could be significantly harmful to [the Respondent]." In *Lettley, supra,* this Court expressly rejected the argument that, "because no other lawyer would have had access to that confidential information, there was no conflict of interest." *Id.* at 44, 746 A.2d at 402.

Because I agree with the Court of Special Appeals that the Circuit Court did not err or abuse "its discretion in determining that [the Respondent's] right to counsel of choice was outweighed by countervailing interests of fairness, maintaining ethical standards, and avoiding conflicts of interests," I would

address the issue of whether the Respondent is entitled to a new trial on the ground that the Circuit Court delivered a coercive "unanimity" instruction.

